**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **NATIONAL OILWELL VARCO, LP,** | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | |
| | § | |
| **v.** | § | |
| | § | **NO. 4:16-cv-02261** |
| **SADEESH SADAGOPAN,** | § | **JURY** |
| **MAJED HAMDEN** | § | |
| **AND KHALED ZANTOUT,** | § | |
| **Defendants.** | § | |
| | § | |

---

## NOV'S MOTION FOR DEFAULT JUDGMENT

---

Plaintiff National Oilwell Varco, LP ("NOV") files this Motion for Default Judgment ("Motion") with supporting documentation on damages against Defendants Sadeesh Sadagopan ("Sadagopan"), Majed Hamdan ("Hamdan"), and Khaled Zantout ("Zantout") (collectively, "Defendants") pursuant to Federal Rule of Civil Procedure 55(b) and the Court's orders [*see* Dkt. 117], and respectfully shows as follows:

### I.
### SUMMARY

Defendants have elected to default on their liability for NOV's claims asserted against them in the Fourth Amended Complaint [Dkt. 97] (the "Complaint"). *See* Dkt. 115; Dkt. 116. NOV moved for entry of default, Defendants agreed to that motion, and the Court entered default against Defendants on liability. *See* Dkt. 118; Dkt. 119. Accordingly, NOV now seeks a final default judgment against Defendants for the relief sought in the Complaint.

The Complaint pleads that Defendants committed fraud, fraud by non-disclosure, conspiracy to defraud, breach of contract, breach of fiduciary duty, and aided and abetted the other

Defendants' and FM's breaches of their fiduciary duties to NOV.  *See* Compl. ¶¶ 44-65.  Each of these claims arise from the known fraudulent and conflict of interest schemes designed and deployed by Defendants and FM (collectively, the "Conspirators") against NOV during the last decade of the Conspirators' employment with NOV.  The schemes pled for in the Complaint can be summarized as follows:

1. **Orient Scheme**.  In 2007, the Conspirators created a strawman company in Oman called Orient Consultants FZE ("Orient Consultants") and set up an agreement between NOV and Orient for supposed "agency work" in Oman and later Yemen.  Thereafter, as NOV did business in Oman and Yemen, the Conspirators would issue invoices from Orient Consultants to NOV for the supposed "agency fee" for that work and use their positions internally to ensure that those invoices were approved and paid by NOV.  *See* Compl. ¶¶ 24-31.

2. **GBS Scheme**.  In 2009 and 2010, the Conspirators used a strawman company, Global Business Supply ("GBS"), to purchase forklifts and related equipment themselves and then lease that equipment to NOV under terms they self-approved using their positions at NOV.  The Conspirators further ensured that these leases continued unchallenged for years, until NOV was alerted to this scheme following a whistleblower complaint in early 2016.  *See* Compl. ¶¶ 19-23.

3. **Viyatek Scheme**.  In 2010 and 2011, the Conspirators used their positions at NOV to extort additional funds from NOV via Viyatek International ("Viyatek"), NOV's agent in Turkey.  To do so, the Conspirators arranged for NOV to pay $2.3 million in commission payments to Viyatek while directing Viyatek to re-route over $1.9 million of those funds to the Conspirators' strawman company, GBS.  *See* Compl. ¶ 40.

4. **Spreadsheet Schemes**.  In addition to the large schemes above, the Conspirators used their positions in Dubai to siphon money from NOV through a variety of other self-dealing scams.  For example, when NOV needed to rent housing for new staff in Dubai, the Conspirators would first buy that housing using family members' names and then arrange the self-dealing lease with NOV.  After FM was promoted and relocated to Houston in late 2010, his quarter-share of the profits for these self-dealing schemes was tracked on an excel ledger (the "Spreadsheet") kept by Defendant Sadagopan.  This ledger was discovered on Defendant Sadagopan's workstation during NOV's whistleblower investigation in early 2016.  *See* Compl. ¶¶ 32-39.

By the five tort and participatory claims in the Complaint, NOV seeks to hold Defendants jointly and severally liable for: (a) disgorgement of the Conspirators' benefits, *i.e.* the proceeds from the above schemes; and (b) return of the non-salary incentive bonuses and stock awards

2

granted to, and received by Defendants while they carried out the known schemes.  *See, e.g.*, Compl. ¶¶ 42, 46, 49, 59, 64-66.[1]  As set forth more fully below and through the evidence enclosed, the amount of these damages are as follows:

| Element | | Amount |
|---|---|---|
| **Conspiracy Proceeds** | | **$ 18,791,503** |
| | Orient Scheme | $ 11,433,356 |
| | GBS Scheme | $  1,585,209 |
| | Viyatek Scheme | $  1,924,485 |
| | Spreadsheet Schemes | $  3,848,453 |
| **Bonuses / Stock Awards** | | **$  3,005,254** |
| | Sadagopan | $    674,565 |
| | Hamdan | $  1,405,099 |
| | Zantout | $    925,590 |
| | **TOTAL:** | $ 21,796,757 |

NOV further seeks an award of exemplary damages in the amount that the Court feels appropriate to penalize Defendants for their fraud, malice and willful misconduct against NOV and to deter similar conduct in the future.  Finally, NOV asks that the final judgment award NOV the appropriate costs, interest, and fees to the extent allowed by law.

## II.
## PROCEDURAL HISTORY

As the Court is aware, the procedural history of this matter is long and extraordinary for a case now set for default judgment.  A brief recitation of the relevant procedural history follows.

---

[1]   NOV further pleads for the recovery of the actual damages resulting from the Defendants' torts and respective breaches of contract.  *See id*.   The damages sought by way of disgorgement are the same as the actual damages sought on NOV's tort and contract claims, and are proved by the same allegations and evidence.  *See generally* Compl. ¶¶ 9-66; *see also* Mem. Op. dated July 11, 2017 [Dkt. 77] pp.12-13 (noting that NOV's breach of contract claim "arises out of the same facts NOV relies on for the intentional tort claims…").

On May 20 and 25, 2016, NOV filed its original and first amended petitions in this action against Defendants in the 334th Judicial District Court of Harris County, Texas.  *See* Dkt. 1-2; Dkt. 1-3.  In June 2016, NOV duly served each Defendant via certified process, consisting of citation and NOV's first amended original petition as certified.  *See* Dkt. 1-5.   On July 28, 2016, Defendants appeared in this case through counsel and removed to this Court on the basis of complete diversity.  *See* Dkt. 1.

In August 2016, Defendants filed motions to dismiss based on personal jurisdiction and forum non conveniens.  *See* Dkt. 2.  In July 2017, after a year of jurisdictional discovery, multiple hearings, and a large amount of party briefing, the Court issued a memorandum opinion denying Defendants' motion to dismiss.  Dkt. 77.

On August 23, 2017, the Court granted NOV leave to file the Complaint, which is the operative complaint in this action and seeks affirmative relief against all Defendants.  *See* Dkt. 96; Dkt. 97.  The Complaint was deemed filed by NOV on the same date.  *See id.*

On November 20, 2017, Defendants Hamdan and Zantout answered the Complaint with leave from the Court.  *See* Dkt. 104; Dkt. 105.  Defendant Sadagopan has not answered the Complaint.  *See* Dkt. 118 ¶ 3.

On November 29, 2017, Defendants Hamdan and Zantout filed a motion to dismiss or stay this case in favor of arbitration.  *See* Dkt. 109.  Defendant Sadagopan filed his joinder to that motion the following day.  *See* Dkt. 110.  NOV opposed the motion. *See* Dkt. 111.  On January 3, 2018, the Court issued a memorandum opinion denying Defendants' motion to dismiss or stay. *See* Dkt. 112.

On or about January 25, 2018, Defendant Sadagopan filed a letter with the Court declaring, *inter alia*: "I am unable to continue defending my position in this case anymore.  I hereby default."

*See* Dkt. 116 p.2.  On January 26, 2018, Defendants Hamdan and Zantout filed a "Request for Entry of Default" declaring, *inter alia*, that "they no longer intend to defend against [NOV's] claims of liability against them.  Accordingly, they request an entry of default pursuant to F.R.C.P. 55(a)."  *See* Dkt. 115 p.1.

On January 30, 2018, the Court ordered NOV to file a motion for entry of default.  *See* Dkt. 117.  NOV filed the motion for entry of default on February 2, 2018.  *See* Dkt. 118.  Defendants agreed to that motion as certified by NOV's counsel therein.  *See* Dkt. 118 p.5; Decl. of Taylor Freeman [Dkt. 118-1] ¶ 11.  On February 2, 2018, the Court granted the agreed motion for entry of default and entered default against Defendants on liability as authorized by Rule 55(a) of the Federal Rules of Civil Procedure.  *See* Dkt. 119.

The Court has previously determined and ruled that it has personal jurisdiction over Defendants with respect to NOV's tort claims against Defendants, which are the same tort claims asserted in the Complaint.  *See* Dkt. 77; *see also* Dkt. 96 p.2 (noting that the Complaint does not add new claims to the prior version).  The Court has further extended pendant personal jurisdiction over Defendants with respect to NOV's contract claims against Defendants, which are the same contract claims asserted in the Complaint.  *See id.*  As demonstrated by the record and stated in the agreed motion for entry of default, Defendants are not minors, incompetent persons, or currently in military service.  *See, e.g.*, Dkt. 118 ¶ 3; Decl. of Taylor Freeman [Dkt. 118-1] ¶ 11.

## III.
## ARGUMENT

### A.    Legal Standard

In determining whether to enter a default judgment against a defendant, Courts in the Fifth Circuit utilize a three-part analysis: 1) whether the entry of default judgment is procedurally warranted, 2) whether there is a sufficient basis in the pleadings for a default judgment on

plaintiff's claims, and 3) what form of relief, if any, a plaintiff should receive. *J & J Sports Prods., Inc. v. Morelia Mexican Rest., Inc.*, 126 F. Supp. 3d 809, 813-14 (N.D. Tex. 2015) (citing *Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998)).

First, to determine whether the entry of default judgment is procedurally warranted, courts consider the following factors:

> [1] whether material issues of fact exist; [2] whether there has been substantial prejudice; [3] whether the grounds for default are clearly established; [4] whether the default was caused by a good faith mistake or excusable neglect; [5] the harshness of a default judgment; and [6] whether the court would think itself obliged to set aside the default on the defendant's motion

*Id.* at 814 (quoting *Lindsey*, 161 F.3d at 893).

Second, "default judgment is proper only if the well-pleaded factual allegations in the [ ] Complaint establish a valid cause of action." *United States v. Giles*, 538 F. Supp. 2d 990, 993 (W.D. Tex. 2008). "[A] defendant, by his default, admits the plaintiff's well-pleaded allegations of fact." *Nishimatsu Constr. Co., Ltd. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975). "Consequently, there are no material facts in dispute." *J & J Sports,* 126 F. Supp. 3d at 814. Thus, once a default has been entered, default judgment is proper for every claim supported by the well-pleaded allegations and with a sufficient basis in the pleadings. *Wooten v. McDonald Transit Assocs. Inc*., 788 F.3d 490, 498 (5th Cir. 2015). This test is satisfied for default-judgment purposes if the allegations in the complaint satisfy the "fair notice" pleading standard of Rule 8 for each claim. *Id.* Thus, "[t]he factual allegations in the complaint need only be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (internal citation and quotation omitted).

Third, once the claims for default judgment are established, a court must determine the form of relief that the plaintiff should receive for such claims. *See J & J Sports,* 126 F. Supp. 3d at 814. Damages can be shown at an evidentiary hearing or by affidavit demonstrating the amounts

6

due. *United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979). This showing does not require proof that the damages were proximately caused by the acts complained of; instead, a plaintiff need only demonstrate that the damages naturally resulted from the injuries alleged. *See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 159 (2nd Cir. 1992). As the *Greyhound Exhibitgroup* court explained:

> There is a categorical distinction between the element "proximate cause," as it pertains to the assignment of liability in the first instance, and "proximate cause" as it relates to the ministerial calculation of damages in the context of a default judgment. With regard to liability, the concept of proximate cause supplies the legal nexus between act and injury, and provides a necessary basis for awarding compensation. Where it is properly alleged in a complaint, proximate cause—going to liability—is completely and irrefutably established upon the defendant's default. . . . [T]he application of proximate cause presumes that liability has been established, and requires only that the compensation sought relate to the damages that naturally flow from the injuries pleaded.

*Id.* (internal citations omitted).

Finally, an evidentiary hearing is unnecessary "where the amount claimed is a liquidated sum or one capable of mathematical calculation." *James v. Frame*, 6 F.3d 307, 310 (5th Cir. 1993). When punitive or exemplary damages are sought, an evidentiary hearing is normally required to determine the appropriate amount for the award. *See id.* However, when evidence on the defendant's conduct has previously been received by the court during the course of the litigation, the court has discretion to forego an evidentiary hearing and assess punitive or exemplary damages based on "detailed affidavits and documentary evidence, supplemented by the [court's] personal knowledge of the record." *Id.* (internal citation omitted).

**B.    Default judgment against Defendants is procedurally warranted.**

As an initial matter, the record clearly establishes that a default judgment against Defendants is procedurally warranted at this time. First, because Defendants have defaulted, "there are no material facts in dispute." *J & J Sports,* 126 F. Supp. 3d at 814. Similarly,

7

Defendants' voluntary election to default after litigating this case for two years establishes that: (a) there has been substantial prejudice to NOV; (b) the grounds for default are clearly established; (c) the default was not caused by a good faith mistake or excusable neglect; (d) any "harshness" of a default judgment has been mitigated; and (e) there would be no cause to set aside the default on a motion by Defendants. *See* Dkt. 115; Dkt. 116 (Defendants' requests for a default); *see also, e.g., J & J Sports,* 126 F. Supp. 3d at 814; *John Perez Graphics & Design, LLC v. Green Tree Inv. Grp., Inc.*, No. 3:12–CV–4194–M, 2013 WL 1828671, at *3 (N.D. Tex. May 1, 2013). Accordingly, all of the *Lindsay* factors for the Court's initial consideration favor a determination that default judgment against Defendants is procedurally warranted here.

## C. Default judgment against Defendants is substantively warranted for each cause of action in the Complaint.

The Complaint pleads six causes of action against each Defendant: (1) fraud, (2) fraud by non-disclosure, (3) conspiracy to defraud, (4) breach of contract, (5) breach of fiduciary duty, and (6) aiding and abetting breach of fiduciary duty. *See* Compl. ¶¶ 44-65. As the Court has already indirectly found via its prior rulings in this case [*see, e.g.*, Dkt. 77, pp.2-3, 8-13, Dkt. 96, pp.1-2; Dkt. 112, p.1], the well-pleaded allegations in the Complaint give fair notice of, and a sufficient basis for, each of NOV's causes of action against Defendants.

The Complaint alleges that Defendants fraudulently embezzled millions of dollars from NOV through a variety of illicit schemes between 2007 and 2016. *See generally* Compl. ¶ 1. The Complaint describes each of the schemes in detail based on the information known to NOV. *See* Compl. ¶¶ 19-23 (GBS), 24-31 (Orient), 32-39 (Spreadsheet), 40 (Viyatek). The Complaint alleges facts demonstrating that Defendants intentionally and actively participated in carrying out each scheme, and in conspiring to commit such schemes with each other and FM. *See, e.g.*, Compl. ¶¶ 36-37, 45-46, 49, 51, 59, 63-65. The Complaint outlines Defendants' employment relationships

8

with NOV giving rise to the fiduciary duties they are alleged to have breached.  *See* Compl. ¶¶ 9-12, 15-16.  The Complaint similarly offers FM's employment relationship with NOV giving rise to his breaches of fiduciary duties for which Defendants are alleged to have aided and abetted.  *See* Compl. ¶¶ 15-16.  The Complaint identifies Defendants' agreements to comply with NOV's policies which give rise to NOV's independent claim of contractual breach.  *See* Compl. ¶¶ 13-14.  The Complaint also describes Defendants' non-disclosures and refusals to cooperate with NOV's whistleblower investigation in 2016 giving rise NOV's request to recover investigation costs in addition to other amounts awarded based on the fraudulent schemes pled in this case.  *See* Compl. ¶ 42.  Finally, the Complaint details the harm alleged to have been proximately caused by the actions giving rise to NOV's causes of action and the corresponding elements of relief sought by NOV.  *See, e.g.*, Compl. ¶¶ 14, 17 (non-salary awards), 20 (GBS profit), 30 (Orient profit), 33, 36 (Spreadsheet profit), 40 (Viyatek profit), 46, 49, 54, 59, 64-68 (relief sought).

In sum, NOV's six claims against Defendants—fraud, fraud by non-disclosure, conspiracy to defraud, breach of contract, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty—are supported by the well-pleaded allegations in the Complaint.  NOV's Complaint gives Defendants fair notice of these claims and the relief NOV seeks against Defendants for each.  *See generally* Compl.  By electing to default, Defendants now admit the allegations establishing their liability to NOV for such claims. *Nishimatsu*, 515 F.2d at 1206.  Accordingly, a default judgment is proper for each of NOV's claims against each Defendant.  *See id.*; *Wooten,* 788 F.3d at 498.

**D.      NOV is entitled to default judgment for $21,796,757 in compensatory damages against Defendants, jointly and severally.**

For its claims against Defendants, NOV seeks a judgment against Defendants, jointly and severally, for compensatory damages in the amount of $21,796,757.  This amount consists of two elements: (1) disgorgement / damages in the amount of the proceeds the Conspirators received

from the pled schemes against NOV ($18,791,503); and (2) disgorgement / damages in the amount of the non-salary bonuses and stock awards the Defendants received from NOV during the course of these schemes ($3,005,254).

Each of these elements "relate[s] to the damages that naturally flow from the injuries pleaded" in the Complaint. *Greyhound Exhibitgroup, Inc.*, 973 F.2d at 159. Each is also "capable of mathematical calculation," *Frame*, 6 F.3d at 310, demonstrated by the detailed, sworn declaration of Jason Pack and documentary evidence filed herewith, and as further supplemented by the significant substantive evidence received by the Court during the course of this litigation and the Court's prior familiarity with the issues in this matter. *See id.* With that, the legal basis and supporting evidence for each element is provided below.

### 1.   Profit Disgorgement (Orient / GBS / Viyatek / Spreadsheet)

#### a)   Legal Basis

Profit disgorgement is a proper element of the remedies that may be awarded for breach of fiduciary duty or fraud. *See ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010) (breach of fiduciary duty); *Tilton v. Marshall*, 925 S.W.2d 672, 680 (Tex. 1996) (fraud). Additionally, both breach of fiduciary duty and fraud can serve as the underlying intentional tort giving rise to a conspiracy or aiding and abetting claim. *See Holden v. Holden*, 456 S.W.3d 642, 659 (Tex. App.—Tyler 2015, no pet.) (breach of fiduciary duty); *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins.*, 51 S.W.3d 573, 583 (Tex. 2001) (fraud). Liability for conspiracy and/or aiding and abetting renders each conspirator/abettor jointly and severally liable for the recovery available for the underlying tort. *See, e.g.*, *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925-926 (Tex. 1979). Thus, defendants who are held liable for conspiring to commit or aiding and abetting breaches of fiduciary duty or fraud become jointly and severally liable for the damages, such as

profit disgorgement, awarded for such torts. *See id.*; *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942).

The profit recoverable by way of disgorgement from a conscious wrongdoer or fiduciary "includes any form of use value, proceeds, or consequential gains that is identifiable and measurable and not unduly remote." Restatement (Third) of Restitution and Unjust Enrichment § 51(5)(a) (2011). The party seeking profit disgorgement has the burden of producing evidence "permitting at least a reasonable approximation of the amount of the wrongful gain," while "[r]esidual risk of uncertainty in calculating net profit is assigned to the defendant." *Id.* at § 51(5)(d); *see also Kinzbach*, 60 S.W.2d at 514 ("It is the law that . . . if the fiduciary takes any gift, gratuity, or benefit in violation of his duty, or acquires any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received.").

Here, Defendants have defaulted on their liability for NOV's claims of, *inter alia*, fraud, breach of fiduciary duty, conspiracy, breach of contract, and aiding and abetting the breaches of fiduciary duty of each other and FM. *See* Dkt. 119; Compl. ¶¶ 44-46, 50-51, 55-65. Accordingly, Defendants may properly be held jointly and severally liable in tort for disgorgement of the Conspirators' proceeds with respect to each scheme. *See Kinzbach*, 160 S.W.2d at 514.[2]

---

2   Alternatively and in tandem, the measure of actual damages for fraud consists of the difference between the value paid and the value received (out-of-pocket) or the difference between the value parted with and the value received (benefit-of-the-bargain). *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998). Similarly, the measure of damages for breach of contract is generally that which restores the injured party to the economic position he would have enjoyed if the contract had been performed. *Sava Gumarska v. Advanced Polymer Sciences, Inc.*, 128 S.W.3d 304, 317 n.6 (Tex. App.—Dallas 2004, no pet.). Here, the damages sought by way of disgorgement are the same as the amounts sought as actual damages, and are proved by the same allegations and evidence. *See generally* Compl. ¶¶ 9-66; *see also* Mem. Op. dated July 11, 2017 [Dkt. 77] pp.12-13. Thus, Defendants

    **b)**  **Amount - $18,791,503**

In total, the Conspirators' collective profit for the Orient, GBS, Viyatek and Spreadsheet schemes is believed and understood by NOV to be $18,791,503.  This amount is broken down and explained below with reference to the supporting documentation for each scheme.

### Orient Scheme

NOV paid the sham entity "Orient Consultants" a total of $11,433,356 as commissions for claimed services as an NOV business agent in Oman.  *See* Declaration of Jason Pack Dated February 9, 2018 ("Pack Decl."), attached as Exhibit 1 hereto, at ¶ 8.  Based on NOV's investigation and the documents uncovered therein, NOV has learned that the claimed "services" of Orient Consultants, if any, were performed by the Conspirators as part of their roles at NOV for which they were already compensated by their salaries.  *See* Pack Decl. ¶ 9.  Thus, $11,433,356 represents the Conspirators' collective proceeds for the Orient Scheme.[3]

### GBS Scheme

NOV paid the sham entity "GBS" a total of AED 6,811,910 ($1,854,610) to lease the forklifts and other equipment purchased by Conspirators as part of this scheme.  *See* Pack Decl. ¶ 11.  Based on NOV's investigation and the documents uncovered therein, NOV understands that the Conspirators' total purchase cost for this equipment was AED 989,500 ($269,401).  *See* Pack

---

could also properly be held liable for the same amount NOV seeks to disgorge as the actual damages resulting by way of their fraud (jointly and severally) or breaches of contract (individually).

[3] Additional direct evidence of the Orient Scheme and the resulting injuries to NOV is contained in the previously-filed Supplemental Declaration of Jason Pack [Dkt. # 58-2] at ¶ 7 and the exhibits filed therewith [Dkt. #58-3 to Dkt. #58-12].

Decl. ¶ 12.   Thus, $1,585,209 represents the Conspirators' collective proceeds ($1,854,610 - $269,401) for the GBS Scheme.[4]

### Viyatek Scheme

NOV paid Viyatek $2.3 million for claimed commissions per the Conspirators' representations and approvals within NOV.   *See* Pack Decl. ¶ 14.   Based on NOV's investigation and the documents uncovered therein, NOV has learned that the Conspirators directed Viyatek to re-route $1,924,485 of those funds to the Conspirators via GBS.   *See* Pack Decl. ¶ 15.   Thus, $1,924,485 represents the Conspirators' collective proceeds for the Viyatek Scheme.

### Spreadsheet Schemes

Based on NOV's investigation and the documents uncovered therein, NOV has learned that the Spreadsheet represents FM's quarter-share of the profits received for additional self-dealing schemes carried out by the Conspirators in Dubai after FM's relocation to Houston in late 2010.   *See* Pack Decl. ¶ 17.   On its face, the Spreadsheet reflects that FM's quarter share of the profits for these schemes between 2011 and 2016 totaled AED 3,533,803.   *See* Pack Decl. ¶ 18. Thus, AED 14,135,211 (AED 3,533,803 x 4) or $3,848,453 represents the Conspirators' collective proceeds for the Spreadsheet Schemes during period of time recorded by the Spreadsheet.[5]

2.      **Return / Disgorgement of Non-Salary Awards**

a)      **Legal Basis**

Like profit disgorgement, fee forfeiture is a proper element of the remedies that may be awarded for willful and deliberate breaches of fiduciary duty.   *See ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010).   "[T]he central purpose of the remedy [of fee

---

[4]      *See also* Declaration of Jason Pack [Dkt. # 53-2] ("Pack 12b Decl.") at ¶¶ 5-14.

[5]      *See also* Pack 12b Decl. at ¶¶ 15-30 and internal Exh. A-E [Dkt. #53-3 at pp.1-22].

forfeiture] is to protect relationships of trust from an agent's disloyalty or other misconduct." *Id.*

(internal citation omitted).  As the Texas Supreme Court further explained:

> [T]he possibility of forfeiture of compensation discourages an agent from taking personal advantage of his position of trust in every situation no matter the circumstances, whether the principal may be injured or not.  The remedy of forfeiture removes any incentive for an agent to stray from his duty of loyalty based on the possibility that the principal will be unharmed or may have difficulty proving the existence or amount of damages.

*Id.* at 873-874 (internal citation omitted).  While fee forfeiture can apply to all types of

compensation, the remedy must "fit the circumstances presented."  *Id.*  The relevant factors to

consider include "[t]he gravity and timing of the breach of duty, the level of intent or fault, whether

the principal received any benefit from the fiduciary despite the breach, the centrality of the breach

to the scope of the fiduciary relationship, and any threatened or actual harm to the principal."  *Id.*

at 875.  Above all, "the remedy must fit the circumstances and work to serve the ultimate goal of

protecting relationships of trust."  *Id.*

Here, NOV has elected not to seek recovery of Defendants' base compensation from NOV

during the time they carried out the known schemes, even though such an award would be fully

within the Court's discretion.  For reference, during the time of the known schemes, NOV paid the

Defendants over $2.5 million in base compensation alone.  *See* Pack Decl. ¶ 20.  NOV will further

forego its initial request that Defendants be held jointly and severally liable for the millions in base

compensation and non-salary awards that their co-conspirator FM received from NOV during the

time of the known schemes.

Instead, NOV requests that Defendants be held jointly and severally liable for the return of

the non-salary incentive bonuses, stock awards, and exercised stock options that Defendants

extracted from NOV by representing their full compliance with NOV's Code of Conduct and

Ethics Policies while at the same time carrying out the known schemes in willful and deliberate

14

breach of their fiduciary duties.  *See* Compl. ¶ 59; *see also* Pack 12b Decl. at ¶¶ 30-36.  These awards would not have been paid but for Defendants' fraudulent misrepresentations, non-disclosures, and breaches of fiduciary duties towards NOV.  *See* Compl. ¶¶ 14, 17; Pack Decl. ¶ 21.  As with profit disgorgement, Defendants' liability for conspiracy and aiding and abetting also renders Defendants jointly and severally liable for the total amount that they should be required to forfeit and/or return.  *See* Compl. ¶ 61; *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925-926 (Tex. 1979); *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (1942).

      **b)**    **Amount - $3,005,254**

From the start of the Orient Consultants scheme in late 2007, through the end of the Conspirators' employments with NOV in 2016, NOV granted, awarded, or released, and the Conspirators received, the following amounts in incentive bonuses and non-salary awards:

| Type | Sadagopan | Hamdan | Zantout | TOTAL |
|---|---|---|---|---|
| Incentive Bonus | $   303,614 | $   801,808 | $  421,000 | **$ 1,526,422** |
| Restricted Stock | $   101,073 | $   127,630 | $  109,225 | **$     337,928** |
| Exercised Options | $   269,878 | $   475,661 | $  395,365 | **$ 1,140,904** |
| **TOTAL** | **$   674,565** | **$ 1,405,099** | **$  925,590** | **$ 3,005,254** |

*See* Pack Decl. ¶ 21.  NOV would not have granted, awarded, or released, and Defendants would not have received, these amounts had NOV been aware of the actions described in the Complaint or had Defendants disclosed those actions to NOV as required.  *See* Pack Decl. ¶ 21.  Thus, $3,005,254 represents the amount of non-salary funds that Defendants received from NOV during and as a result of their fraud, which should be accordingly be forfeited and returned.

**E.**    **NOV requests that the Court also award exemplary damages against each Defendant in an amount equal to NOV's compensatory damages.**

Exemplary damages are recoverable for successful actions based in fraud as well as actions for breach of fiduciary duty where the injury resulted from the defendant's fraud, malice, or gross negligence.  Tex. Civ. Prac. & Rem. Code § 41.003; *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318

S.W.3d 867, 873 (Tex. 2010).  Exemplary damages are available in addition to economic damages and equitable remedies such as profit disgorgement and fee forfeiture. *Swinnea v. ERI Consulting Eng'rs, Inc.*, 481 S.W.3d 747, 753 (Tex. App.—Tyler 2016, no pet.).

Exemplary damages must be reasonably proportioned to compensatory damages, whether sought in relation to monetary damages or equitable relief.  *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981).  Factors to consider in determining whether an award of exemplary damages is reasonably proportioned include (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety.  *Id.*

Although exemplary and other unliquidated damages are ordinarily not awarded in default judgments without an evidentiary hearing, a court has discretion to forego a hearing when the default judgment arises after the court is already familiar with the case and can make findings based on an ample record.  *See James v. Frame*, 6 F.3d 307, 310-11 (5th Cir. 1993).  Additionally, no evidence is required to prove a culpable mental state, because "conduct on which liability is based may be taken as true as a consequence of the default."  *Frame v. S-H, Inc.*, 967 F.2d 194, 205 (5th Cir. 1992); *see also AE Marketing LLC v. Jenkins-Baldwin Corp.*, No. 3:07-CV-0321-F, 2013 WL 12226763 at *3 (N.D. Tex. May 22, 2013) (awarding exemplary damages as part of a default judgment on Texas statutory fraud because, *inter alia*, "the willful conduct requirement is established by the default judgment."); *Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 509 (2d Cir. 1991) (approving exemplary damages as part of a default judgment on a claim under a New York law requiring gross, wanton, or willful conduct), *cert. denied*, 503 U.S. 1006 (1992).

Here, the Complaint alleges that each Defendant worked and conspired to siphon and embezzle millions of dollars from NOV over the span of nearly a decade.  *See* Compl. ¶¶ 9-42.  The Complaint further alleges numerous examples of the deliberate actions of each Defendant in furtherance of the fraudulent schemes against NOV.  *See id.*  Defendants, by their default, have conclusively established the truth of these allegations and the malice and intentional fraud shown thereby.  *See* Dkt. 119; *Frame*, 967 F.2d at 205; *AE Marketing*, 2013 WL 12226763 at \*3.  Accordingly, an award for exemplary damages against each Defendant is appropriate in this case.  *See* Tex. Civ. Prac. & Rem. Code § 41.003; *AE Marketing*, 2013 WL 12226763 at \*3; *Swinnea*, 481 S.W.3d at 753.

In sum, NOV's Complaint, the evidence filed in record, and even the tortuous procedural history of this case, offer a clear and compelling picture of the intentional and egregious fraud Defendants committed against the company that employed them for over a decade, promoted them into positions of great responsibility, and made them wealthy.  This fraud was intentional and performed with malice on the part of each Defendant.

Among others, Defendants' concerted efforts to embezzle tens of millions of dollars from NOV through sham entities (*i.e.* Orient Consultants and GBS) created by Defendants for that very purpose offends the public sense of justice and propriety in Texas, in the UAE, and everywhere else in the world.  That same universal sense of justice demands that this type of conduct be deterred in the future, and a judgment limited to the amount of improperly received funds does not offer that deterrence.  Moreover, the prior discovery battles over Defendants' financial records in this case, and Defendants' elections to default shortly before the hearing on NOV's motion to compel those records [*see* Dkts. 115-117], suggests that Defendants' fraud against NOV extends far beyond the currently known schemes and damages asserted in the Complaint.  For all of these

reasons, the allegations in the Complaint and the record in this case support an award of exemplary damages against each Defendant in an amount reasonably proportioned to NOV's compensatory damages ($21,796,757) as the Court may deem appropriate.  *See Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981).

**F.      NOV requests that the Court's judgment also assess post-judgment interest and costs of court against Defendants and further permit NOV to seek its costs and fees.**

NOV requests that the Court enter default judgment ordering that NOV recover post-judgment interest on the award against each Defendant at the rate of 5% per year compounded annually, together with court costs and NOV's attorneys' fees.  NOV will obtain and submit the clerk's costs sheet in advance of the hearing in this matter.  Pursuant to Local Rule 54.2 and Federal Rule of Civil Procedure 54(d)(2), NOV requests permission to file a bill of costs and/or a motion for attorneys' fees and related nontaxable expenses within fourteen (14) days after entry of the judgment.

**IV.**
**CONCLUSION**

Default judgment is procedurally and substantively proper at this time.  Defendants' defaults establishes their commissions of fraud, fraud by non-disclosure, conspiracy to defraud, breach of contract, breach of fiduciary duty, and aiding and abetting each other's and FM's breaches of fiduciary duties to NOV, as well as their liability to NOV for the injuries naturally resulting therefrom.  Defendants' default likewise establishes that their acts were committed with the requisite culpable mental states, *i.e.* knowingly, intentionally, and/or with malice.

The evidence provided by the enclosed declaration and supporting documentation, as well as the significant amount of other evidence filed into the record for this matter, establish the basis, fairness, and accuracy of NOV's claim for compensatory damages against Defendants in the amount of $21,796,757.  Similarly, Defendants' conclusively-established actions, culpable mental

states, and decade-long conspiracy against NOV present a history and pattern of conduct which would cause judges and juries, as a matter of standard practice, to award additional exemplary damages against each Defendant in an amount reasonably proportioned to NOV's compensatory damages.

For these reasons, NOV respectfully requests that the Court grant default judgment against Defendants for each claim in the Complaint and award the following recovery to NOV and against Defendants for such claims:

a) $21,796,757 in compensatory damages, assessed against Defendants jointly and severally;

b) the maximum amount that the Court deems as reasonably proportioned to NOV's compensatory damages and otherwise appropriate in exemplary damages;

c) post-judgment interest (5% per year compounded annually); and

d) costs of court.

NOV further requests that it be permitted to file a post-judgment motion for its' attorneys' fees if appropriate within fourteen days after the entry of judgment under Federal Rule of Civil Procedure 54(d)(2), and for all such other and further relief as the Court deems just and proper.

DATED:  February 9, 2018.

OF COUNSEL:                                          Respectfully submitted,

Shawn M. Bates                                  /s/ John Zavitsanos
State Bar No. 24027287                          John Zavitsanos
Federal ID No. 30758                            State Bar No. 2251650
Taylor Freeman                                  Federal ID No. 9122
State Bar No. 24083025                          Ahmad, Zavitsanos, Anaipakos, Alavi &
Federal ID No. 1839523                          Mensing, P.C.
1221 McKinney, Suite 2500                       1221 McKinney, Suite 2500
Houston, Texas  77010                           Houston, Texas  77010
Phone: 713.655.1101                             Phone: 713.655.1101
Fax: 713.655.0062                               Fax: 713.655.0062
sbates@azalaw.com                               jzavitsanos@azalaw.com
tfreeman@azalaw.com
                                                Attorney-in-Charge for Defendant National
Richard W. Staff                                Oilwell Varco, LP
State Bar No. 18991330
Federal ID No.  9754
Jeff Weems
State Bar No. 21027600
Federal ID No. 12155
STAFF WEEMS LLP
6363 Woodway, Suite 1100
Houston, TX 77057
Phone: 281.903.5988
Fax: 281.903.5992
rstaff@staffweems.com
jweems@staffweems.com

## CERTIFICATE OF SERVICE

I certify that on February 9, 2018, a true and correct copy of the foregoing was served by ECF to all counsel and unrepresented parties of record and by certified mail (return receipt requested) to all defendant-respondents pursuant to Local Rule 5.5, as follows:

Mark S. Hellinger (*by ECF and CM/RRR*)
THE HELLINGER LAW FIRM
12 Greenway Plaza, Suite 1100
Houston, Texas 77046
Tel: (713) 623-1152
Fax: (713) 623-1221
mhellinger@hellingerlawfirm.com
*Counsel for Defendant Hamdan and Defendant Zantout*

Majed Hamdan (*by CM/RRR*)
Jebel Ali Gardens
Building 76
Dubai
Tel: (+971) 50 7711210
majed0hamdan@gmail.com
*Defendant-Respondent*

Khaled Zantout (*by CM/RRR*)
Acacia Avenues Villa TH04
Dubai
Tel: (+971) 50 6559484
Khaled9291@gmail.com
*Defendant-Respondent*

Sadeesh Sadagopan (*by ECF and CM/RRR*)
#19, Garden View Villas
Jebel Ali Village
The Gardens
Dubai
Tel: (+971) 50 5525370
sadeesh.sadagopan@gmail.com
*Unrepresented Defendant-Respondent*

*/s/ Taylor Freeman*
Taylor Freeman