UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NATIONAL OILWELL VARCO, LP | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | NO. 4:16-cv-02261 |
| | § | JURY |
| | § | |
| SADEESH SADAGOPAN, | § | |
| MAJED HAMDEN, | § | |
| and KHALED ZANTOUT, | § | |
| Defendants. | § | |

**DEFENDANTS HAMDAN AND ZANTOUT'S**
**RESPONSE TO PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT**

Mark S. Hellinger
Texas Bar No. 09394975
Federal ID No. 13485
THE HELLINGER LAW FIRM
12 Greenway Plaza, Suite 1100
Houston, Texas 77046
Tel:  (713) 623-1152
Fax: (713) 623-1221
email: mhellinger@hellingerlawfirm.com

Attorney-in-Charge for Defendants Majed
Hamdan and Khaled Zantout

## TABLE OF CONTENTS

Page

Table of Contents…………………………………………………………..…  ii
Table of Authorities …………………………………………………………  iii
I.      Summary of response ……………………………………………..……  1
II.     NOV's tort claims are governed by UAE law …………………………...  1
        A.    Applicable law and standard of review      ………………….……  1
        B.    UAE law and Texas law are substantially different   …………………  2
        C.    Background Facts Relevant to the Choice of Law Analysis  ………….  2
        D.    Analysis of the Restatement Section 145 Contacts  ………………….  5
              1.    The place where the injury occurred   ………………………  5
              2.    The place where the conduct causing the injury occurred  …….  5
              3.    The domicil, residence, nationality, place of  …………………  8
                    incorporation and place of business of the parties
              4.    The place where the relationship between the parties  …………  9
                    was centered
              5.    Factors applicable to restitution claims ………………..…….  10
        E.    Analysis of the Restatement Section 6 Factors  …………………………  10
        F.    Because UAE law applies, NOV cannot recover tort damages  ………...  11
III.    NOV's pleadings do not support a default judgment ………………………….  13
        A.    Insufficient basis as to GBS claims ………………………………  14
        B.    Insufficient basis as to Orient claims   ……………………………  14
        C.    Insufficient basis as to Viyatek claims   ………………………………..  15
        D.    Insufficient basis as to spreadsheet claims  …………………………  16
        E.    Insufficient basis as to aiding and abetting claims  …………………  17
IV.     NOV cannot prove actual damages ………………………………………...  17
        A.    GBS           ………………………………………………………  17
        B.    Orient        ………………………………………………………  18
        C.    Viyatek       ………………………………………………………  20
        D.    "Spreadsheet claims"  ………………………………………………  21
V.      NOV is not entitled to disgorgement damages ………………………………  21
        A.    Disgorgement is not a remedy for common law fraud or …………..……  21
              breach of contract
        B.    NOV cannot show that defendants received improper benefits  …......  22
        C.    Defendants' stock bonuses and options should not be subject  ………..  23
              to disgorgement
VI.     Application of proportionate responsibility   …………………………………  23
VII.    Conclusion        ………………………………………………………  24

## Table of Authorities

**Cases**                                                                                          **Page**

*Allstate Inc. Co. v. Receivable Fin. Co.*,
LLC, 501 F.3d 398, 412 (5th Cir. 2015)  …………………………………………..  21, 22

*Altschuler v. Cohen,*
471 F.Supp. 1372, 1380 (S.D. Tex. 1979)  …………………………………………  17

*Ashcroft v. Iqbal*, 556 U.S. 662, 678–79,
29 S. Ct. 1937, 1949–50, 173 L. Ed. 2d 868 (2009)  ……………………………………..  15

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544, 556, 127 S.Ct. 1955 (2007)  ………………………………………………… 15

*CPS Intl., Inc. v. Dresser Industries, Inc.*,
911 S.W.2d 18, 28 (Tex. App. -- El Paso 1995, writ denied)…………………………..  7

*Duncan v. Cessna Aircraft Co.*,
665 S.W.2d 414, 419 (Tex. 1984)  …………………………………………………..  1

*EA Oil Service, Inc. v. Mobil Exploration & Producing Turkmenistan, Inc.,*
2000 WL 552406 (Tex. App. -- Houston [14th Dist.] May 4, 2000, no writ)
(not designated for publication)……………………………………………………..  7

*Formosa Plastics Corp. USA v. Presidio Eng'rs*
*& Contractors, Inc.,* 960 S.W.2d 41, 49 (Tex. 1998)  …………………………………  22

*Gutierrez v. Collins,*
583 S.W.2d 312, 318 (Tex.1979)  …………………………………………………...  2

*Henry v. Masson,*
333 S.W.3d 825, 849 (Tex. App. -- Houston [1st Dist.] 2010, no pet.) …………………  22

*In re Air Disaster at Ramstein Air Base, Germany,*

81 F.3d 570, 576 (5th Cir. 1996) …………………………………………………  2

*Jelec USA, Inc. v. Safety Controls, Inc.*,
498 F.Supp.2d 945, 951 (S.D. Tex. 2007)  ………………………………………..  10

*Longview Energy Co. v. Huff Energy Fund, LP,*
533 S.W.3d 866, 877 (Tex. 2017)  ………………………………………………..  22

*Mayo v. Hartford Life Ins. Co.,*

354 F.3d 400, 403 (5th Cir. 2004) ……………………………………………… 1

*Nishimatsu Const. Co., Ltd. v. Houston Nat. Bank,*
515 F.2d 1200, 1206 (5th Cir. 1975) ……………………………………….. 13

*Southwestern Bell Tel. Co. v. DeLanney,*
809 S.W.2d 493 (Tex. 1991) ……………………………………………………. 2

*U.S. v. Shipco General, Inc*.,
814 F.2d 1011, 1014 (5th Cir. 1987) …………………………………………… 17

**Statutes**

Fed. R. Civ. Pro. 44.1……………………………………………………………… 11

Fed. R. Civ. Pro 54(c) …………………………………………………………… 13

Tex. Civ. Prac. & Rem. Code, Chapter 33.001 *et seq*. ………………………….. 23,24

**Other Authorities**

Restatement (Second) of Conflict of Laws §§ 6, 145
(Am. Law Inst. 1971) …………………………………………………………… 2,10

Restatement (Second) of Conflict of Law §145,
comment e ………………………………………………………………………7

Restatement (Second) of Conflict of Laws §148
(Am. Law Inst. 1971) …………………………………………………………… 5

Restatement (Second) of Conflict of Laws §221(2)………………………………… 9

Defendants Majed Hamdan and Khaled Zantout ("Defendants") file this Response to Plaintiff's Motion for Default Judgment. This response is made subject to and without waiving Defendants' previously-asserted objections based on lack of personal jurisdiction.

## I.    Summary of Response

Defendants are civil engineers and citizens of Lebanon who worked for Plaintiff NOV in Dubai for more than ten years. They deny that they did anything to harm NOV. To the contrary, they worked tirelessly to grow NOV's operations in the Middle East, and NOV earned hundreds of millions of dollars in revenues as a direct result of their efforts. NOV is not attempting to recover any actual, out-of-pocket damages. Instead, it proposes a speculative damages model requesting disgorgement of benefits that the Defendants never received.

Defendants request that the final judgment be a take-nothing judgment for the following reasons: (1) under UAE law, which applies to NOV's tort claims, NOV is not entitled to recover tort damages, (2) NOV's pleadings are insufficient to support a default judgment, (3) NOV cannot meet its burden of proving damages, (4) NOV cannot show that the Defendants have received any ill-gotten benefits that are subject to disgorgement; and (5) in the alternative, Defendants' liability, if any, should be reduced by application of the Texas rules of proportional responsibility.

## II.    NOV's Tort Claims Are Governed by UAE Law

### A.    Applicable law and standard of review

"In making a choice of law determination, a federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state, here Texas." *Mayo v. Hartford Life Ins. Co.,* 354 F.3d 400, 403 (5th Cir. 2004). The trial court should first determine if there is a significant difference between the law of the respective forums. If the relevant law is the same in each forum, there is no need to conduct a choice of law analysis. *See Duncan v. Cessna Aircraft Co.*, 665

S.W.2d 414, 419 (Tex. 1984).

For choice of law issues relating to tort claims, Texas courts use the "most significant relationship" test set forth in Sections 6 and 145 of the ALI's Restatement (Second) of Conflict of Laws. *Gutierrez v. Collins,* 583 S.W.2d 312, 318 (Tex.1979); Restatement (Second) of Conflict of Laws §§ 6, 145 (Am. Law Inst. 1971). "These contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.* The "most significant relationship" test turns not on the number of the contacts, but on their quality. *Gutierrez*, 583 S.W.2 at 319. The trial court's choice of law determination is a question of law that is reviewed *de novo. See In re Air Disaster at Ramstein Air Base, Germany,* 81 F.3d 570, 576 (5th Cir. 1996).

**B.    UAE law and Texas law are substantially different**

The key relevant differences between UAE law and Texas law involve the classification of claims as tort claims or contract claims, and the effect of that determination. Texas law attempts to resolve this issue in the "contort" line of cases that began with *Southwestern Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493 (Tex. 1991). UAE law takes a more black-and-white approach, holding that all disputes arising out of an employment relationship are treated as contract claims. *See* Defendants' "Rule 44.1 Notice of Applicability of Foreign Law" [Docket # 113], which was filed on January 22, 2018. UAE law also differs with Texas law in that the UAE does not recognize conspiracy or aiding and abetting claims, but instead holds that each defendant is responsible only for his own actions. *Id.* In short, the relevant laws of the two forums are substantially different, and a choice of law determination is therefore required.

**C.    Background facts relevant to the choice of law analysis**

A company such as NOV cannot simply set up shop and do business in the UAE. Instead, it must first obtain a trading license and register to do business within one of the available "free

zones" that the UAE has established to attract foreign businesses.  Since 1997, NOV has been licensed to do business within one of those free zones, the Jebel Ali Free Zone ("JAFZA"), which is located in Dubai.[1]

It is not surprising that NOV chose to set up shop in JAFZA.  JAFZA has a massive port facility that has been named "Best Seaport in the Middle East" for twenty-one consecutive years.[2] JAFZA hosts 7,300 international companies, and it has an annual capacity of 19.5 million shipping containers.[3]  JAFZA's port ranks ninth-largest worldwide in shipping capacity, and its capacity is nearly double that of the largest American port, the Port of Los Angeles.[4]  JAFZA records more than $80 billion dollars in annual non-oil trading, which is more than the GDP of most countries.[5]

When NOV registered a branch office in JAFZA, it became subject to UAE laws and the JAFZA Free Zone Rules.[6]  Under the JAFZA Rules, NOV was required to maintain a physical office in JAFZA.[7]  As is shown in detail below, NOV's registered branch in JAFZA is where virtually all of the acts and omissions relevant to this case are alleged to have taken place.  NOV's registered branch office in JAFZA is referred to herein as "NOV Dubai."

---

[1] See Trading License, Exhibit A.
[2] *See* Gulf News Shipping, "Dubai's Gem: How Jebel Ali Free Zone Has Turned the Emirate into a Global Trading Powerhouse," January 16, 2018, attached as Exhibit B.
[3] *Id*.
[4] *Id*.; Exhibit C, World Shipping Council, "Top 50 World Container Ports" (2018).
[5] Exhibit C.
[6] Decree No 1. of 1985, "Establishment of The Free Zone Authority in Jebel Ali Port," authorizes JAFZA to issue rules and regulations, to regulate companies and their activities in the Free Zone, to issue trading licenses, and to regulate other aspects of companies doing business in JAFZA.  *See* Jebel Ali Free Zone Rules and Regulations, (5th ed. 2014), attached as Exhibit D, at Section 4, "Powers of JAFZA."  The citations in this response are to the Fifth Edition of the JAFZA Rules (2014).  Copies of the Fourth Edition (2005) and the Sixth Edition (2016) were attached as Exhibits B and D respectively to Defendants' Rule 44.1 Notice of Applicability of Foreign Law (Docket # 113).
[7] Exhibit D, JAFZA Rules, at §7.2(b) and §8.



Jebel Ali Port

Foreign nationals cannot legally work in the UAE unless they have a work permit and are sponsored for a residency visa through a locally licensed and registered entity.  It is illegal for employees to be in the UAE otherwise.[8]  In addition, employees who are sponsored to work in JAFZA are not allowed to work outside JAFZA.[9]

NOV had been operating in Dubai under this legal and regulatory framework for several years before it hired Mr. Hamdan and Mr. Zantout.  They are civil engineers and citizens of Lebanon.  They were not "expat" employees sent by NOV in Houston to work overseas.  Instead, they were hired and sponsored directly by NOV Dubai to work exclusively in Dubai.

The employment contracts signed by Mr. Hamdan and Mr. Zantout are attached as Exhibits E and F.[10]  These contracts were signed in JAFZA by NOV Dubai's local management (using NOV Dubai's post office box in JAFZA as its address).  Under the JAFZA Rules, the granting of a business license to NOV made its registered branch office a "client," which was the actual entity that employed the Defendants in Dubai.

---

[8] *Id*. at §14.9.
[9] *Id*. at §11.1.8  ("A Sponsored Employee is only allowed to work in the Free Zone.")
[10]  Defendant Sadeesh Sadagopan's employment contracts are attached as Exhibit G.

4

The JAFZA Rules require that specific terms relating to the key aspects of the employment relationship (such as compensation, benefits, termination, and dispute resolution) must be included in written employment contracts with sponsored employees, and the contracts signed by Mr. Hamdan and Mr. Zantout closely follow those terms and include references to UAE law and JAFZA regulations.[11]   The contracts do not include an express choice of law clause, but they were clearly entered into with a view toward UAE law and the JAFZA Rules.

### D.      Analysis of the Restatement Section 145 contacts

NOV has asserted tort claims for fraud, conspiracy, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty.   In its pleadings and in its Motion for Default Judgment, NOV groups its claims into four subcategories: (1) GBS claims, (2) Orient claims, (3) Viyatek claims, and (4) Spreadsheet claims.   Section 145 of the Restatement lists the contacts to be considered in determining which forum has the "most significant relationship" to the parties and to NOV's claims.[12]   Those contacts strongly support the application of UAE law to NOV's tort claims.

**(1)   The place where the injury occurred and (2) the place where the conduct causing the injury occurred.**   These contacts are addressed together because NOV's alleged injury is intangible, which causes the analysis of these contacts to merge.

<u>GBS claims</u>.   NOV contends that the Defendants caused NOV to enter into an equipment lease containing unfavorable terms with a Dubai-based leasing company, Global Business Supply

---

[11]   *Id.* at §11.5.5.

[12]   In addition, the contacts listed in Section 148 of the Restatement inform the choice of law determination with regard to fraud claims.  Because NOV does not allege that the Defendants made any false representations in Texas, the relevant contacts are those listed in Section 148(2), which are: (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations, (b) the place where the plaintiff received the representations, (c) the place where the defendant made the representations, d) the domicil, residence, nationality, place of incorporation and place of business of the parties, (e) the place where a tangible thing which is the subject of the transaction was situated at the time, and (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

("GBS").   GBS is a Free Zone Entity licensed in the UAE and, at all relevant times, its business operations were centered in Dubai.  *See* Declaration of Sadeesh Sadagopan, Exhibit J.

A copy of the GBS lease is attached as Exhibit K.  The lease was negotiated and signed in Dubai.   Sadagopan Declaration, Exhibit J.  The terms of the lease were negotiated and approved locally in Dubai.  *Id.*  The lease was signed by both NOV Dubai and GBS in Dubai.  Exhibit K. The subject of the lease is equipment located in Dubai to be used by NOV Dubai in Dubai.  In the lease, NOV agrees that the equipment "will only be operated and/or driven by a NOV employee licensed to do so by the UAE authorities." *Id.* at Art.1(c).

There is no evidence of any involvement whatsoever by NOV Houston office with regard to the GBS lease and no evidence of any misrepresentations that were made to or relied upon by NOV in Houston in entering into the lease.

The lease required payments to be made in Dubai.  Exhibit K.  Those payments were made by local employees of NOV Dubai, from NOV Dubai's local bank account in Dubai, in UAE currency, directly to GBS's local bank account in Dubai.  Exhibit J.  If, as alleged, the Defendants "controlled" GBS or entered into a secret agreement with GBS (which Defendants deny), that could have happened only in Dubai, where the parties were co-located at all relevant times.  These contacts point to Dubai.

b.   <u>Orient claims</u>.  Orient Consultants FZE was established and based in the UAE. In 2007, NOV entered into a representation agreement under which Orient agreed to serve as NOV's agent for Oman.   That agreement was signed by NOV in Houston and by Orient in Dubai. Exhibit H, Declaration of Majed Hamdan.  Orient was to perform the agreement in Dubai and Oman.  NOV was to perform the agreement by making payments to Orient in Dubai.  All payments

under the agreement were directed to and received by Orient in Dubai.[13]

NOV alleges that Defendants used Orient to receive fictitious commissions. However, NOV received hundreds of millions of dollars in revenues from the contracts on which the commissions were paid. *See* spreadsheet attached as Exhibit A-1 to NOV's Motion for Default Judgment. Thus, NOV did not suffer an economic injury relating to Orient. Because there was no physical injury and no economic loss, the place of injury is less important than usual in the choice of law analysis.[14]

Because NOV's claim is primarily one for disgorgement, the only real "injury" is that the Defendants allegedly received compensation that they did not disclose to NOV.[15] In other words, the "injury" was the breach itself. At all relevant times, the Defendants lived and worked in Dubai.

The fact that payments to Orient may have originated from (or may have eventually been reflected on the books of) NOV in Houston does not mean that the "injury" happened in Houston for purposes of the choice of law analysis. *See, e.g., CPS Intl., Inc. v. Dresser Industries, Inc*., 911 S.W.2d 18, 28 (Tex. App. -- El Paso 1995, writ denied) (finding that any financial harm in Texas was "a mere measurement of and was produced by" the injury in Saudi Arabia); *EA Oil Service, Inc. v. Mobil Exploration & Producing Turkmenistan, Inc.,* 2000 WL 552406 (Tex. App. -- Houston [14th Dist.] May 4, 2000, no writ)(not designated for publication)("Turkmenistan is clearly the locale where the injury occurred, even though its effects were also felt by EAI's Texas

---

[13]   Bank records relating to Orient that were subpoenaed by NOV from Standard Chartered Bank and HSBC are attached as Exhibits L and M, respectively.

[14] The significance of the location of the injury varies depending on the type of injury. In a tort case where a discrete personal injury occurs in a specific location, that place is an important factor in the choice of law analysis. Restatement (Second) of Conflict of Law §145, comment e. For example, if a car accident happened in Louisiana, that would be an important factor pointing to a Louisiana forum. However, where (as here) the alleged injury is intangible, this factor is less important in the choice of law analysis. *Id.*

[15] Because the purpose of disgorgement is deterrence and not compensation, the location of the conduct that caused the injury is a more important contact.

headquarters.").

   c. <u>Viyatek claims</u>. Defendants show below that NOV's pleadings relating to Viyatek are insufficient to support a default judgment.  Viyatek was NOV's agent in Turkey and it assisted NOV Dubai in winning a contract for the sale of two rigs in Iraq.  The details of this transaction are described below and in the declaration of Khaled Zantout, which is attached as Exhibit I.

   NOV alleges that it paid Viyatek $2.4 million in commissions and that the Defendants directed Viyatek to transfer $1.9 million of that amount to GBS.  [Fourth Amended Complaint at ¶40].  However, there was no financial injury to NOV, which made tens of millions of dollars of profit on the Viatek transaction.  *Id.*  Instead, as with its Orient claims, the "injury" suggested by NOV is that Defendants (in Dubai) may have colluded with and received undisclosed compensation from GBS (also in Dubai).  Again, these contacts point to Dubai.

   d. "Spreadsheet claims." NOV's allegations regarding its "spreadsheet claims" are nebulous at best.  NOV discovered a spreadsheet prepared by Defendant Sadagopan that, according to NOV, documents payments made by him to "FM"  [NOV's Fourth Amended Complaint, at ¶¶32-35].  As was the case with NOV's Orient and Viyatek claims, the payments by Mr. Sadagopan  did not, in themselves, cause an economic injury to NOV.  Other than allegedly making payments to FM, NOV has not alleged that Mr. Sadagopan (or any of the Defendants) engaged in any conduct outside of Dubai that caused an injury to NOV.

   **3**. **The domicile, residence, nationality, place of incorporation and place of business of the parties.** NOV is a Delaware limited partnership that has its principal place of business in Houston, Texas.  NOV established a registered branch office in Dubai, which is where the day-to-day activities of the Defendants took place.  Defendants Hamdan and Zantout are citizens of

Lebanon. Defendant Sadagopan is a citizen of India.  At all times relevant to this suit, the Defendants were residents of Dubai who lived and worked in Dubai.

> **4.**      **The place where the relationship between the parties was centered.**   The *only* relationship between the parties was the lengthy employment relationship between Defendants and NOV Dubai in Dubai.  The Defendants were employed by NOV exclusively in Dubai (never in Texas).  That employment relationship was created under and governed by UAE law.  NOV's tort claims are based on and arise out of that employment relationship.  For example, NOV alleges that "by virtue of their employment relationship with NOV, Defendants owed fiduciary duties to NOV."  [Plaintiff's Fourth Amended Complaint at ¶56].    Because the parties had a preexisting and lengthy relationship that was exclusively centered in Dubai, this contact should be treated as the most relevant and important contact for purposes of the choice of law analysis, and it overwhelmingly favors the application of UAE law.

> **5.**      **Factors applicable to restitution claims.**       Because NOV is primarily seeking disgorgement, the contacts set forth in Section 221 of the Restatement (Second) of Torts would seem to be instructive.  Those contacts are: (a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship, (2) the place where the benefit or enrichment was received, (c) the place where the act conferring the benefit was done, (d) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (e) the place where the physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment." Restatement (Second) of Conflict of Laws §221(2).  Every one of those contacts (other than NOV's place of incorporation and business), if applied to NOV's claims, would strongly point to the UAE.

**E.     Analysis of the Restatement Section 6 factors**

In making the choice of law determination, the Court should also consider the factors set forth in Section 6 of the Restatement (Second) of Conflict of Laws, which include:  (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

The Defendants were working in Dubai pursuant to a system of laws and policies under which the UAE allows foreign workers to live and work in the UAE.  More than eighty percent of the UAE's population consists of foreign workers.[16]  In 2013, the UAE had a migrant population of 7.8 million out of a total population of 9.2 million.  The UAE is heavily reliant on foreign labor to sustain its economy, with foreign workers comprising over 90% of its private workforce.  *Id.* The UAE has a compelling interest in ensuring that the rights of foreign workers are protected and that it maintains a consistent system of civil and criminal laws that govern foreign workers and companies operating within the UAE.

The fourth and sixth factors ((d) the protection of justified expectations, and (f) certainty, predictability and uniformity of result) apply more to contract issues and are of little importance in addressing choice of law issues relating to tort claims.  *Jelec USA, Inc. v. Safety Controls, Inc.*, 498 F.Supp.2d 945, 951 (S.D. Tex. 2007).

The UAE's bright-line distinction between tort claims and contract claims, and its rejection of civil conspiracy claims in favor of the principle that individuals are responsible only for their own conduct, may conflict with Texas law but they are otherwise easy to apply and do not offend

---

[16] *See, e.g.* Migration Policy Institute, "Labor Migration in the United Arab Emirates: Challenges and Responses," September 18, 2013 (attached as Exhibit P).

Texas public policy.  Accordingly, the Court should apply UAE law to NOV's claims for damages.

**F.**     **Because UAE law applies, NOV cannot recover tort damages**

"In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. Pro. 44.1.   The information in this section was contained in Defendants' "Rule 44.1 Notice of Applicability of Foreign Law" [Docket # 113], which was filed on January 22, 2018, and is incorporated herein by reference.

Early in this case, Defendants filed a Rule 12(b)(3) motion under the doctrine of *forum non conveniens*. [Docket #2].  Defendants later filed an Amended Motion to Dismiss [Docket #45] that included a request for the same relief.   For the reasons stated in that motion, Defendants asserted that Dubai was a more appropriate forum for this case.

In response, NOV contended that Dubai was not an adequate and available forum because UAE law does not recognize NOV's claims sounding in tort.  For example, NOV stated that UAE law does not recognize causes of action for breach of fiduciary duty or aiding and abetting breach of fiduciary duty.  *See* NOV's Response to Defendants' Amended Rule 12 Motion to Dismiss [Docket #53], at pg. 19.  "Thus," NOV judicially admitted, "if the case goes to Dubai, NOV will be unable to prosecute seven out of eight claims." *Id.*

NOV supported its opposition to Defendants' Rule 12(c) motion with the declaration of Abad Awad, who NOV sponsored as an expert on UAE law.   The "Expert Declaration of Abed Awad" is attached as Exhibit N.[17]

In his declaration, Mr. Awad sets out his qualifications and states that he had been retained

---

[17] Defendants are introducing Mr. Awad's declaration only for the specific legal opinions referenced in this motion. Elsewhere in his declaration, he makes numerous disparaging remarks about the UAE and its courts.  Defendants expressly disavow any agreement or affiliation with those remarks or with any of the political views that Mr. Awad has expressed in the declaration or elsewhere.

by NOV to provide expert opinions about UAE law, including the question: "Does Dubai law recognize NOV's causes of action?"[18]   His conclusion was that [t]he majority of NOV's causes of action do not exist under Dubai law."[19]

Mr. Awad explained what happens to NOV's claims if UAE law applies:

The result would be that all of NOV's tort claims would disappear. *See, generally*, Dr. Abdullah Saif Al Suboosi, *The Interaction between Tort and Contract for Choice of Law Purposes*, pp. 10-11 (2015) ("In the UAE domestic law, it is well established that such interaction between tort and contract is not allowed. Accordingly, the plaintiff in any claim that might be counted as a tort or a contract can only sue in a contract rather than a tort, according to the principle of the 'binding force of the contract'. This is without any possibility to bring proceedings in tort rather than a contract, even if the tortious claim was more favorable to the plaintiff. [ . . .] . Accordingly one could say that in the case of an employment contract where a related tort occurred, the court seized would consider the claim as a contractual [sic] and subject it to the law of the contract.").

*Id*. at ¶28.

Mr. Awad goes on to state:

30.   **UAE law does not recognize a cause of action for breach of fiduciary duty.**   The defendants are mere employees. While they have an obligation to loyalty and honesty in their employment with NOV under UAE law, a breach of this is not an independent cause of action like breach of fiduciary duty. This concept for civil compensation does not exist. In Dubai, it would sound in criminal law.

31.   **UAE law does not recognize a civil cause of action for fraud.** This is a criminal matter. If the Defendant is convicted of a crime, then the victim or plaintiff would pursue a civil action for any direct losses, and, even then, the civil matter will likely be stayed pending final determination of the criminal matter. Article 102, UAE Code of Civil Procedure.

32.   More important, the determination of the criminal matter impacts the civil action. **The civil action would not sound in civil fraud because there is no civil fraud cause of action. The same applies to NOV's cause of action for fraud for non-disclosure. And, aiding and abetting does not exist as a cause of action in Dubai, either. Only the person directly responsible would be held liable. This would fall under possibly a criminal count, not a civil count. There is no cause of action for conspiracy to defraud, either.** At most, it would possibly

---

[18] Exhibit N at ¶3, 4(ii).
[19] *Id*. at ¶5(ii), ¶¶7-18.

sound in a criminal fraud count. The concept of a conspiracy theory is problematic in the UAE, like in many other Muslim countries, as the same violates Islamic law inasmuch as Islamic law holds only the actual person causing the harm responsible.

33. **Similarly, there is no cause of action in Dubai for a constructive trust, either.** A constructive trust is an equitable remedy creating an implied trust to claw back in the past as a legal theory to compensate an aggrieved plaintiff. **UAE law does not support such claims.**

34. Clearly, sending NOV's action to Dubai would prejudice the majority of their causes of action. As such, NOV does not have an adequate remedy in Dubai. **In fact, as explained above, all of NOV's tort causes of action would not survive under Dubai law.**

*Id*. at ¶¶30-34 (emphasis added).

Finally, Mr. Awad summarized his opinions as follows:

As detailed above, NOV's causes of action sound both in contract and tort. **Pursuant to Dubai law, as a general rule, a litigant is not permitted to plead tort causes of action where the parties have a contractual relationship. Here, the contract causes of action control the governing law, remedies and damages. NOV's tort claims will be barred under Dubai law.**

*Id*. at ¶55 (emphasis added).  Thus, by NOV's own admission, if UAE law applies to its tort claims, NOV would not be entitled to recover damages in this suit under those claims.

Therefore, the default judgment to be entered by the Court should not include any damages for any tort claims that the Court has found to be governed by UAE law.

### IV.  NOV's pleadings do not support a default judgment

By their default, the Defendants are deemed to have admitted the well-pleaded allegations of fact contained in NOV's Fourth Amended Complaint.  *Nishimatsu Const. Co., Ltd. v. Houston Nat. Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).  However, the Defendants are "not held to admit facts that are not well-pleaded or to admit conclusions of law."  *Id.*  When a default has been entered, "[t]here must be a sufficient basis in the pleadings for the judgment entered."  *Nishimatsu*, 515 F.2d at 1206.  F.R.C.P. 54(c) provides that "[a] default judgment must not differ in kind from,

or exceed in amount, what is demanded in the pleadings."

## A.   Insufficient basis as to GBS claims

NOV's allegations relating to the GBS lease are contained in Paragraphs 20 through 23 of its Fourth Amended Complaint.   NOV alleges actions and knowledge on the part of Defendant Sadagopan but does not allege that Defendants Hamdan or Zantout had knowledge of or received any improper "kickbacks" from GBS.   Instead, NOV leaps to an unsupported conclusion, alleging: "The bottom line is that the Conspirators were participants in the fraudulent scheme to profit from GBS's lease of heavy equipment to NOV"  *Id*. at 23.   This allegation cannot support a default judgment.

## B.   Insufficient basis as to Orient claims

As to Orient, NOV first alleges that Orient's owner (Nadar Assaf) was formerly listed as an NOV "trainee" and was Defendant Zantout's personal assistant.   [Fourth Amended Complaint at ¶25].   Based on these allegations, NOV makes the following conclusory assertions:

> None of the information uncovered shows Assaf had training, capability or expertise to be NOV's representative/agent to sell drilling rigs and equipment in Oman.  Asaf and Orient were nothing more than a front for the Conspirators to collect millions in purported "commissions" paid to Orient for work performed by and under the direction and control of the Conspirators.  Of course, it was the same job that one or more of the Defendants already had with NOV.  That is, Zantout, Hamdan (and FM)'s job duties at NOV included selling drilling rigs and equipment in the Middle East, including Oman. They were well paid to perform these duties. But, insatiable greed led them to embezzle millions of dollars in fictitious commissions paid to Orient.

*Id*. at ¶26.   These allegations are insufficient to support the entry of a default judgment.

The Supreme Court has held that allegations such as these do not meet the requirements of Rule 8(a)(2):

> First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice…

14

> (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). …Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense… But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

*Ashcroft v. Iqbal*, 556 U.S. 662, 678–79, 129 S. Ct. 1937, 1949–50, 173 L. Ed. 2d 868 (2009)(internal citations omitted).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S.Ct. 1955 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" *Id.* (citing *Twombly*, 550 U.S. at 557).

NOV has not alleged that Orient actually paid any money to the Defendants. It has set forth no factual allegations and pointed to no evidence to support the conclusory statement that the Defendants "embezzle[d] millions of dollars in fictitious commissions." In short, this allegation is a "conspiracy theory" that is not supported by factual allegations.

## C.   Insufficient basis as to Viyatek claims

NOV's pleadings relating to Viyatek are even less sufficient. They consist in their entirety of the following:

> 40.   Additional improper transactions directed to Texas are the subject of NOV's ongoing investigation. For example, NOV recently learned that Viyatek International ("Viyatek"), transferred a total of over $1.9 million to GBS in 2010 and 2011, as reflected in the bank records of HSBC Bank and Standard Chartered

> Bank.   Viyatek's payments to GBS were made shortly after NOV in Houston paid
> Viyatek about $2.3 million on invoices for alleged commissions.   The invoices to
> NOV were approved by Majed Hamdan and submitted by him to NOV in Houston
> for its approval and payment.   Viyatek has advised that the Conspirators directed
> Viyatek to make payment to GBS in the amount of over $1.9 million from the $2.3
> million paid by NOV to Viyatek.

[Fourth Amended Complaint at ¶40].   Significantly, NOV does not allege that any of the money

that was paid to Viyatek was redirected to any of the Defendants or that GBS actually paid any of

those funds to the Defendants.   This falls far short of what is required to support a default judgment.

NOV made no mention of Orient or Viyatek until its Fourth Amended Complaint.

Defendants' former counsel stated that they opposed NOV's motion for leave to file that pleading,

but they were in the process of withdrawing as counsel and did not file a response in opposition.

The Court, in its order granting NOV leave to file its Fourth Amended Complaint, ruled in pertinent

part:

> "[T]he proposed complaint increases the scope of the conspiracy alleged against
> the remaining defendants by specifically alleging that they caused National Oilwell
> to pay millions of dollars to sales agents… Although the additional facts about the
> payments to sales agents widen the scope of the alleged conspiracy, the conspiracy
> claim has long been in the case.   **The proposed complaint does not add claims or
> increase the damages or other remedies sought."**

Order Granting Motion for Leave [Docket # 96], at pg. 2 (emphasis added).   In short, any default

judgment entered in this case should not include any damages relating to Orient or Viyatek.

**D.     Insufficient basis as to "spreadsheet claims"**

NOV's allegations relating to the "spreadsheet claims" are contained in Paragraphs 32

through 36 of its Fourth Amended Complaint.     NOV alleges that a spreadsheet prepared by

Defendant Sadagopan shows sums that he paid to FM and documents FM's share of proceeds from

the GBS lease and other transactions.   *Id*. at ¶¶2-35.   NOV's only allegation against Defendants

Hamdan and Zantout is "NOV alleges upon information and belief that Defendants likewise

obtained similar benefits, all to NOV's detriment and harm." *Id*. at 36.  This is a naked, speculative allegation cannot support a default judgment for liability based on the "spreadsheet claims," which appear, in any event, to be duplicative of NOV's other damages claims.

### E.    Insufficient basis as to conspiracy and aiding and abetting claims

NOV fails to allege facts sufficient to support a default judgment as to its claims for conspiracy and aiding and abetting.   NOV alleges that the "spreadsheet" reflects payments made by Defendant Sadagopan to or on behalf of FM, but NOV makes no specific allegations that link Defendants Hamdan and Zantout to a conspiracy, except to note that they made cash withdrawals prior to taking trips where they would be meeting FM.[20]   These allegations are insufficient to support a default judgment for conspiracy or for aiding and abetting breach of fiduciary duty.

### IV.    NOV cannot prove actual damages

Even if Texas law applies to NOV's claims relating to GBS, Defendants are entitled to a take-nothing judgment on those claims because NOV cannot meet its burden of proving damages.

A default judgment does not establish the plaintiff's damages.  *U.S. v. Shipco General, Inc*., 814 F.2d 1011, 1014 (5th Cir. 1987).  "After a default judgment, the plaintiff's well-pleaded allegations are taken as true, except regarding damages." *Id*.  The plaintiff must establish its damages by competent proof according to an established legal standard.  *Altschuler v. Cohen,* 471 F.Supp. 1372, 1380 (S.D. Tex. 1979). NOV has not proven and cannot prove that it incurred any actual out-of-pocket damages caused by anything the Defendants did or failed to do.

### A.    GBS

---

[20] The Defendants have previously submitted declarations in which they deny that they carried cash that they paid to FM.  In addition, each of the Defendants routinely made large cash withdrawals because Dubai was and still is a cash economy in which most purchases are typically made in case.  *See* GulfNews.com, "Reasons Why Cash Is Still King in UAE," August 18, 2018 (stating that ten out of twelve major "purchase categories" are still typically paid in the UAE by cash)(copy attached as Exhibit O).

NOV alleges that the GBS lease charged inflated rates for leased equipment. However, it has made no attempt to prove what the reasonable rental rate would have been. NOV has designated no expert witness and provided no expert testimony as to why any provisions in the GBS lease were commercially unreasonable or unfair to GBS.

## B. Orient

NOV has long recognized the importance of having agents in foreign countries, particularly in the Middle East. It is not unusual for NOV to have multiple agents in each country, with each separate division having its own agents. [*See* Exhibit H, Declaration of Majed Hamdan at ¶9]. In addition, over the years, NOV has acquired other companies and inherited their existing agents. At one point, NOV had between 500 and 600 agents in foreign countries. *Id.*

Prior to 2007, although Oman was part of the territory covered by NOV Dubai's Rig Systems division (the division in which the Defendants worked), that division did very little business in Oman. *Id.* at ¶10. As Defendant Hamdan explains in his attached declaration, this was in large part because the Rig Systems division in Dubai had no agent in Oman and no physical presence in Oman. *Id.* In addition, it lacked quality contacts in Oman. Most of the drilling companies in the Middle East are large companies, either government owned or semi-governmental. *Id.* The decision makers in those companies are often unreachable without personal connections. Agents are needed to facilitate the process and get things done on the ground. *Id.*

In 2007, NOV entered into an agency contract with Orient Consultants FZE, a company that was established as a Free Zone Entity in the UAE. The agency agreement was signed in Dubai by Orient. *Id.* at ¶11.

NOV has implied that it was not necessary for NOV to use an agent in Oman. However, Omani law, like the law of many Middle Eastern countries, prohibits companies such as NOV

from selling products in Oman without a special license or without using an agent.[21]   It would have been against the law for NOV Dubai to sell products to Oman without using an agent.  *Id.*

In addition, as Mr. Hamdan states in his attached declaration, NOV Dubai did not have the contacts and connections needed to effectively market and sell products in Oman.  Exhibit H at ¶13.  NOV had little to no access to the key decision makers.  *Id.*  In the Middle East as elsewhere, personal relationships are critical.  Orient had qualified and highly experienced people such as Salim Al Rawahi, an Omani who had extensive experience in the oil and gas industry in Oman and had credibility and good connections with operators and drilling companies in Oman.  *Id.*  His expertise and connections opened many doors for NOV and resulted in hundreds of millions of dollars in sales by NOV in Oman.  According to Mr. Hamdan, there is no way that he or the other Defendants could have generated those sales on their own, without the assistance of Orient and Mr. Al Rawahi.  *Id.*

Around 2009 or 2010, NOV's Houston office recommended that Orient, which had been operating in Dubai, move to Oman.  *Id.* at 15.  At NOV's urging, Orient formed a new Omani company, Orient Energy Services, LLC.   Under the Omani law referred to above, the Omani agent is required to be a local Omani agent or qualified company.[22]   In November 2012, NOV entered into a new agency agreement with the new company, Orient Energy Services, LLC.  *Id.*  That agreement was prepared by NOV's legal departments in Houston and Dubai, which had previously performed due diligence of Orient in Dubai and Oman along with lawyers from an outside law firm.  *Id.*  Mr. Hamdan signed the new agency agreement in Dubai on behalf of NOV, through its registered branch in Dubai.  *Id.*  He signed that agreement at the instruction of and with the detailed involvement of NOV's lawyers.  *Id.*

---

[21] See, e.g., AP Consulting, "Doing Business in Oman," attached as Exhibit Q.
[22]   *See* Exhibit Q, "Doing Business in Oman"

NOV has very strict rules relating to the payment of commissions to its agents.  *Id.* at ¶16.  NOV paid its agents only after it received proof of (1) a confirmed order, (2) completion of the order, (3) delivery of the order, and (4) receipt of full payment by NOV from the purchaser.  *Id.*  In other words, NOV did not pay commissions on a sale unless it first confirmed that it had been paid the full contract amount that was due for the specific sale.  *Id.*   All of the commissions that were paid to Orient went through the proper reporting and approval procedures and were paid directly to Orient by NOV after NOV determined that they were legitimate.  *Id.*

In support of its Motion for Default Judgment, NOV submitted a spreadsheet that documents commissions paid by NOV to Orient Consultants FZE, then to Orient Energy Services LLC.  [NOV's Motion at Exhibit 1-A].  That spreadsheet also documents the amount paid to NOV for each of the contracts on which it paid a commission to Orient.  The total dollar amount of those contracts was in excess of $260,000,000.00.  *Id.*  By any account, NOV profited greatly from the sales for which it paid commissions to Orient, and did not incur any economic damages.

## C.   Viyatek

Defendant Khaled Zantout was the person with NOV Dubai who had the most involvement with the Viyatek transaction, and he discusses that transaction in his declaration, which is attached as Exhibit I.  At the time, NOV Dubai's fiercest competitor was Drillmec, an Italian company which has dominated the market in Iraq since 2003.  *Id.* at pg. 3.  In 2010, Drillmec was very close to winning a contract with TPIC (Turkish International Petroleum) to sell two rigs into Iraq.  *Id.*  However, Mr. Zantout worked with agents in the region, including Viyatek, who helped him with TPIC.  *Id.*  After great effort they succeeded in winning the contract for NOV.  *Id.*  This was a breakthrough deal for NOV but, as Mr. Hamdan recalls, NOV did not want to handle shipping into Iraq because of the chaotic security situation and other logistical challenges.  *Id.*  In order to get

the deal done, Viyatek had to agree to pay for ground transportation, logistics, and security for the convoys. *Id.* They used GBS for help with the logistics and GBS in turn hired Overseas Development to handle some of the transportation issues. *Id.* This was a major task because the rigs needed to be delivered about a hundred miles inland into Iraq and it typically takes about fifty trucks to transport the components for each rig. *Id.* In addition, extensive (and expensive) security was needed to protect the convoy.

The contract amount paid to NOV in connection with the Viyatel transaction was approximately $65 million dollars, and Mr. Zantout also sold the customer a parts package totaling approximately $5 million dollars, at a high profit margin. *Id.* NOV was very happy with the sale, and made tens of millions of dollars in profit from the transaction. *Id.* Accordingly, NOV cannot possible contend that it suffered damages as a result of the transaction.

**D.     "Spreadsheet claims."**     NOV cannot show that it incurred any damages as a result of Defendant Sadagopan's spreadsheet or anything described therein.  In addition, the spreadsheet damages appear to be duplicative of other damages claimed by NOV.

**V.     NOV is not entitled to disgorgement damages**

**A.     Disgorgement is not a remedy for common law fraud or breach of contract**

"[I]t is questionable whether disgorgement is an appropriate measure of damages in an action alleging Texas common law fraud." *Allstate Inc. Co. v. Receivable Fin. Co*., LLC, 501 F.3d 398, 412 (5th Cir. 2015).  Instead, fraud damages are measured as follows under Texas law:

> Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the-bargain measure. The out-of-pocket measure computes the difference between the value paid and the value received, while the benefit-of-the-bargain measure computes the difference between the value as represented and the value received." (internal citations omitted).

*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 49 (Tex.

1998).  The damages sought by NOV do not fall within either of these measures.  Furthermore,

"[d]isgorgement of profits is not a measure of damages available in a breach of contract action.

*Henry v. Masson*, 333 S.W.3d 825, 849 (Tex. App. -- Houston [1st Dist.] 2010, no pet.).

**B.      NOV cannot show that Defendants received improper benefits**

Any disgorgement award must be based on ill-gotten *profits* received by a defendant as a

result of a breach of fiduciary duty.  *Longview Energy Co. v. Huff Energy Fund, LP*, 533 S.W.3d

866, 877 (Tex. 2017).  As the Fifth Circuit explains:

> Because disgorgement is meant to be remedial and not punitive, it is limited to
> "property causally related to the wrongdoing" at issue. *SEC v. First City Fin. Corp.,*
> 890 F.2d 1215, 1231 (D.C.Cir.1989). Accordingly, the party seeking disgorgement
> must distinguish between that which has been legally and illegally obtained. *Id.* In
> actions brought by the SEC involving a securities violation, "disgorgement need
> only be a reasonable approximation of profits causally connected to the violation."
> *Id.*  However, "in a private action, the party seeking monetary compensation may
> have a greater burden to prove its claim to the amount requested." *Id.* at 1232 n. 24.
> Still, in the instant case we need not determine whether a more onerous burden of
> proof should be used since we find that [plaintiffs] have not satisfied the lower
> burden-of-proof threshold of providing a reasonable approximation of what the
> defendants-appellants illegally obtained.

*Allstate Ins. Co.,* 501 F.3d at 413.  A disgorgement award cannot be based on "conjecture and

speculation" as to the amount the defendants are alleged to have wrongfully obtained.  *Id.*

NOV has failed to meet its burden of proving damages that are legitimately subject to

disgorgement.  Rather than provide even a reasonable approximation of those damages, NOV

alleges that, with the sole exception of an offset for the purchase price of the GBS equipment,

every penny it ever paid to GBS or to Orient is subject to disgorgement, and every penny of the

sums paid by Viyatek to GBS is subject to disgorgement.

In doing so, NOV ignores the results of the subpoenas that it sent to numerous banks.  For

example, those records show that Orient paid nothing to the Defendants, but paid out millions of

dollars to people *other than* the Defendants.  Defendants will provide other examples at the

upcoming hearing. In short, NOV's disgorgement claims are based on "conjecture and speculation" and fail to give even a reasonable approximation of benefits wrongfully obtained by the Defendants, nor does NOV show that any such damages were causally related to the alleged wrongdoing.

## C.     Defendants' stock bonuses and options should not be subject to disgorgement

NOV is also seeking disgorgement of "non-salary awards" (bonuses and stock awards) that were given to the Defendants beginning around 2005, thirteen years ago. Those awards were well-earned and were not causally related to any wrongdoing. Instead, similar awards were made to all eligible and similarly-situated NOV employees, and were based largely on NOV's financial success for a given year, to which Defendants unquestionably contributed.

The Defendants each worked for NOV in Dubai for more than a decade. Their attached declarations set out in detail some of the outstanding contributions and personal sacrifices they made to NOV, which resulted in hundreds of millions of dollars in revenue to NOV. *See* Exhibits H - J. They worked on thousands of projects, earning the praise of NOV's management. The allegations made in this case relate only to a small percentage of the services that they performed for NOV over the years. Disgorgement is an equitable remedy and it is not warranted under the circumstances of this case.

## VI.     Application of proportionate responsibility

If Texas law is held to apply to any of NOV's tort claims, those claims are governed by Texas's Proportionate Responsibility statute, Tex. Civ. Prac. & Rem. Code, Chapter 33.001 *et seq*. Chapter 33.002 states that the proportionate responsibility rules apply to "any cause of action based in tort in which a defendant, settling person, or responsible third person is found responsible for a percentage of the harm for which relief is sought." *Id.* at § 33.002(a)(1). The percentage of each

is to be determined by the trier of fact, here the Court.  *Id*. at § 33.003(a).  The Defendants request the Court to determine the percentage of responsibility of each Defendant and to limit the liability of each Defendant to his proportionate share of damages, pursuant to Section 33.013(a).

Defendants also request that the amount of any damages recoverable by NOV be reduced by the sum of the dollar amount of any settlement agreement between NOV and FM, the Defendants' alleged co-conspirator.

**Conclusion**

For the reasons stated above, Defendants Majed Hamdan and Khaled Zantout respectfully request the Court to enter a final take-nothing judgment in the form attached.  Defendants also request all other and further relief, both legal and equitable, to which they may be justly entitled.

Respectfully submitted,

By:  _____
      Mark S. Hellinger
      Texas Bar No. 09394975
      Federal ID No. 13485
      THE HELLINGER LAW FIRM
      12 Greenway Plaza, Suite 1100
      Houston, Texas 77046
      Tel:  (713) 623-1152
      Fax: (713) 623-1221
      email: mhellinger@hellingerlawfirm.com

      Attorney-in-Charge for Defendants Majed
      Hamdan and Khaled Zantout

## Certificate of Service

I certify that the foregoing document was served on all counsel and parties pro se by ECF and/or electronic mail on March 2, 2018.

_____
      Mark S. Hellinger