EXHIBIT J

**DECLARATION OF SADEESH SADAGOPAN**

My name is Sadeesh Sadagopan. I am over eighteen years of age, of sound mind, and competent in all respects to make this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct.

NOI, now NOV, was granted a license in 1997 to carry out business activities in the Jebel Ali Free Zone as a local branch. This branch is subject to the rules and regulations of the JAFZ and the UAE in force from time to time. NOV executed a Personnel Secondment Agreement (PSA) with JAFZA as the sponsor. Under the JAFZA Rules, the granting of such a license rendered a branch of NOV a "client" which was the actual entity that employed the defendants in Dubai.

I was employed by the JAFZ entity as Accountant in 2001 and then promoted to VP of Human Resources for the MEAIP Region as a local employee on a local contract. The Employment was conditional on obtaining a sponsorship / residence visa sponsored by the JAFZ.

Defendants work, compensation, visas/work permits, hours of work, holidays, annual vacations were all based on and bound by the UAE laws and had nothing to do with Texas or USA or the so-called Texas-based company.

**Growth and expansion of NOV in the region**

Since 1997, the UAE team of NOI started to develop business and grew its foot print in the region through generic growth orchestrated by the local team and the acquisitions made at the Corporate levels. Starting from a headcount of 1 in 1997 with revenues of a couple of 100 thousand dollars, it grew to be 4500+ employees in the region with annual revenues of over 1.5B dollars by the close of 2014/2015.

In 2002 when the NOI's first "model state-of-the-art facility" housing all the product lines of the company were under one roof, was being built in the JAFZ, Dubai, I have spent hundreds of hours supervising the construction work, furniture fit out, installation and commissioning of equipment and the final grand opening. This was not part of my job description.

In 2003 when the gulf war broke out, there were no personnel traveling from the West to assist with ongoing projects in the Middle East. I was one of the few who after hours, went to the rig up yard with coveralls on to assist the team working there with whatever I could. This included, cutting pipe, threading pipe and also supervising the basic welders. The project was completed on time and the customer recognized this effort with a momento and a token of appreciation. This was not part of my job description.

Up until 2008, I headed the finance department of the region. We set up the team and were audited and approved to be SOX compliance.

I set up the IT department, had the entire network system labelled and documented and handed over the set up IT department to Houston.

I set up the Administration department with proper processes and systems in place and handed the department over to Houston.

I set up the Payroll department. Implemented HCM payroll and handed over the payroll department to Houston. Also implemented payroll processing for India and were setting up the processes to cover the rest of the Middle East and North Africa.

Assisted the corporate teams on at least 10 acquisitions and integrated employees from acquisitions within record time.

When the Arab Spring broke out, NOV did not have a security department. I singlehandedly coordinated and successfully evacuated NOV employees and their dependants from Libya, Algeria, Egypt and Bahrain. The fact that this was such a huge accomplishment will be evidenced by the 100s of "thank you" and appreciative emails I received from the employees' their families, local, senior, upper and executive management of the company.

Set up the Emergency Response Team, and was its Regional Team Leader. Went around the NOV operations in the region setting up local teams and training them to handle emergency situations.

When NOV brought in a broker for the medical insurance program, the Middle East and Africa premium, which was direct with an insurance company, jumped 9% to accommodate the broker's commissions. This translated to about AED 2.2 M (US $ 600,000). I went around the brokers with the approvals of my boss and negotiated direct with the insurance company a 10% discount on the premium to nullify this additional expense of US $ 600K.

**Vendor developments**

In the Middle East, cultures are very strong and evident. As NOV was growing since its inception in 1997, it needed the support of a lot of vendors to be able to compete and deliver on its commitments to its customers. As part of this growing up journey, employees on both sides do bond and become friends. Within NOI, it was a mandate that we were to develop our vendors and grow, educate and progress them along as NOI grew.

GBS is one of many such vendors. They were an office supply company. The employees of NOV have assisted this company as they did with many other vendors as NOV grew over the years. During 2008 GBS could not sustain the global economic meltdown anymore and made the decision to shut shop and look at something else. GBS let NOV know that they were willing to

assist in any way needed if there was any opportunity within NOV that would secure their investment.

**2008 Global economic downturn – CAPEX and GBS Agreement**

As the economic downturn hit the world around in 2008, the Middle East region was still keeping its head above water and was the only region that was a profitable business for NOV and also feeding the other regions with some orders to keep their operations running.

As was expected there was a blanket-ban on any CAPEX (Capital Expenditure) spending until such time the situation improved. NOVs internal regulations are that any expense over US $ 10,000 was considered a CAPEX.

However the Middle East operation was doing well with its Rig building activity with confirmed orders on hand and needed support equipment to fulfil its commitments to the confirmed customer orders on hand. The need was for some heavy moving equipment like forklifts and a 10 ton truck. The local management then decided that they needed to lease the equipment as purchase was not an option. The analysis made by the local team was that the situation would improve in about 18 to 24 months, after which the local NOV branch could seek approval to purchase needed equipment rather than renting it.

Leasing of equipment is never cheaper than the purchase proposition. Moreover the traditional leasing companies, including NOV's preferred leasing company's charges are fixed only for the 8 working-hours of the day and 5 or 6 work days of the week. Any public holidays and weekends and after-hours would be charged at a premium (like an overtime charge). As NOV's rig building activity was busy there was no way we could control or limit the usage of the equipment within the 8 hours of the day and the work days of the week. This can be evidenced by the time keeping records of NOV for the employees.

Other traditional leasing companies also charge for operators with the same working hour conditions as the equipment. NOV personnel were well used to operating these equipment so NOV could do with the option of equipment lease only. They also limit the usage of the equipment to the site that the equipment is leased to and would charge a Mobilization and Demobilization fees for every change in the working site. NOV had rig building activity in more than one site within Jebel Ali Free Zone. However, they do take care of the maintenance of the equipment.

Jebel Ali Free Zone (JAFZ) rules also state that a company within the JAFZ should use trucks from an authorized trucking company or should be their own.

The local management taking all of the above into consideration and also not to pay out a lot more than need be, and for a limited period of 2 years, arrived at the following conclusion.

- Check with anyone who would be interested to invest on the equipment that NOV wanted.
- The terms would be for 2 years only.
- The equipment would be per the specs that NOV provided.
- No limitation on the number of hours or the number of days per month, the equipment would be used and at any of the NOV sites, for a fixed cost per month.
- NOV would take care of the maintenance of the equipment. (The rationale here was that these were all brand new equipment, so the first year would be covered under warranty and the second year should not bring in any major maintenance issues).
- The truck would be registered under NOV's name as though it was owned by NOV so as to comply with the rules of JAFZ and also to allow free passage whenever it crossed the borders of the JAFZ or the UAE into neighboring countries like Oman.

This requirement was sent out to the vendors. Most were not interested and many did not want to agree to the above terms in full. NOV then contacted GBS to see if they were interested though they were not a leasing company.  This contract award followed due process.

Several months after the GBS agreement was signed, NOV's local branch needed some additional equipment.  GBS recommended that NOV lease-to-purchase the equipment where NOV pay the lease amount for a fixed number of months as would be agreed and thereafter take ownership of the equipment. This was not approved by the finance group as they thought this would be seen as evading the no-CAPEX restriction, though it was through deferred monthly instalments. So this proposal from GBS was not executed and the second set of equipment went through the same agreement and terms as the first set.

During this time email from an employee in Egypt indicated that the equipment could be sourced at a cheaper rate locally. This employee was not aware or not considerate of many facts;

1. NOV did not have a legal presence in Egypt, then but was operating thro' its agent who already was causing problems with funds they were collecting on behalf of / from NOV and not passing it through timely. If the agent did the same with a vendor for these equipment, the capabilities of the local operation would be compromised.
2. The local vendors would not provide brand new equipment.
3. The local vendors may deviate from the specifications that NOV would dictate.

For this reason, the local management decided that the equipment required for Egypt would also be sourced the same way as for the UAE, which meant we would get brand new equipment, the brand we ask for and the specifications that are required.

The GBS agreement was for a term of only two years. The agreement could have been terminated or at least not renewed at the end of the lease term; March 2011. The management reviews costs every quarter. The local finance team presents financials to the local management on a monthly basis. I was not involved with the renewals of this agreement nor to my knowledge were any of the other defendants.

The JAFZ / UAE entity of NOV signed the agreement with GBS (a local UAE company) for the lease of equipment. The parties who signed this agreement were in the UAE representing the UAE entities respectively. The parties using the equipment for NOV are in the UAE. NOV's accountants who processed the GBS invoices worked in the local operations department in NOV's local branch in the UAE. The Managers approving these GBS invoices were in the UAE. The payment to GBS for the lease invoices were paid by NOV's local branch office in the UAE currency (AED) from a local AED bank account of NOV directly to GBS in the UAE.

NOV claims that the contract between NOV and GBS is overpriced. The process of awarding this contract followed due process where multiple quotes were invited and negotiated and the one that was best for NOV was the one that was awarded.

Further a comparison between the GBS contract and a quote for similar equipment from NOV's preferred supplier, Al Faris is tabulated below for clarity and putting to rest this allegation beyond doubt.

*All amounts denoted below are in AED, unless specified otherwise.*

| Details | | | | Global Business Supply | | | | NOVs preferred supplier - Al Faris | | | Variance | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Equipment | Make | Fuel | Qty | Contract Rate / Unit | Contract Rate / Tot | Discounted Rate / Unit | Discounted Rate / Tot | Qty | Contract Rate / Unit | Contract Rate / Tot | to original contract | to discounted rates |
| 3 Ton Forklift | Caterpillar | Diesel | 2.00 | 13,500.00 | 27,000.00 | 10,800.00 | 21,600.00 | 2.00 | 18,200.00 | 36,400.00 | 9,400.00 | 14,800.00 |
| 2.5 Ton Forklift | Caterpillar | Electric | 1.00 | 14,000.00 | 14,000.00 | 11,200.00 | 11,200.00 | 1.00 | 28,600.00 | 28,600.00 | 14,600.00 | 17,400.00 |
| 7 Ton Forklift | Caterpillar | Diesel | 1.00 | 17,500.00 | 17,500.00 | 14,000.00 | 14,000.00 | 1.00 | 26,000.00 | 26,000.00 | 8,500.00 | 12,000.00 |
| Bendi 45 Forktruck | Bendi | Diesel | 1.00 | 19,000.00 | 19,000.00 | 14,250.00 | 14,250.00 | 1.00 | 71,500.00 | 71,500.00 | 52,500.00 | 57,250.00 |
| 10 Ton Pickup Truck | Mitsubishi Fuso | Diesel | 1.00 | 7,100.00 | 7,100.00 | 5,680.00 | 5,680.00 | 1.00 | 23,400.00 | 23,400.00 | 16,300.00 | 17,720.00 |
| | | | | | 84,600.00 | | 66,730.00 | | | 185,900.00 | 101,300.00 | 119,170.00 |
| | | | | | | | | | | | $27,602.18 | $32,471.39 |

| BASIC TERMS AND CONDITIONS | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | without operator | | | | with operator | | | | |
| | | | | 7 days a week / 365 days a year | | | | 26 days / month - excl Fri and Pub holidays | | | | |
| | | | | 24 hrs / day | | | | 10 hr / day | | | | |
| | | | | without diesel | | | | without diesel | | | | |
| | | | | 2 year lease | | | | 2 year lease | | | | |
| | | | | Excluding Maintenance | | | | Includes Maintenance | | | | |

| Summary | |
|---|---|
| | In summary, NOV has actually saved to the tune of at least US $ 27K per month over the last 6+ years as compared to pricing from their preferred supplier, Al Faris |
| | Not to mention the additional savings that would have been realized for work beyond 10 hours on each day and any Friday or Public holiday over the last 6+ years. |
| | The offer from Al Faris to include an operator and maintenance is the only favorable items but the cost savings based on GBS proposal far outweighs these costs. |
| | NOV employees can / have been operating all of these equipment. |
| | NOV employees anyways get compensated for overtime so an additional payment to the operator would be a double dip to the costs. |
| | Maint. is not expensive - all brand new eqpt and carried warranty for the first year and should not have any major issues in the 2nd year. |

All of these explain and demonstrate that the GBS contract was indeed set up with the best interest of NOV and to actually improve the economics of NOV.

The employees of NOV who were managing the various responsibilities and were in the chain of transactions for processing the GBS equipment and invoices, had the option to terminate this

agreement in March 2011 or at any time afterwards. They decided not to do so, which indicates that it was not a bad deal for NOV after all.

**Leasing by NOV**

NOV has always leased everything needed, if they could, even if the math of buy versus lease pointed towards the "buy" option. Further, if they had a global arrangement, the same would be forced down on local operations even if the local operational costs would increase.

Example 1.
NOV in Dubai used to procure air tickets from a local vendor in Dubai. The vendor went on to offer free shuttle services to and from the airport for all NOV employees, which would otherwise cost NOV around $50 to $100. Further the vendor did not charge any transaction fees and was available to call 24/7 to book, make changes, reissue or cancel flight tickets. NOV then introduced a global partner they chose for the ease of pulling reports, though not justified, where this new agent would charge about $60 as a transaction fee for every single transaction – book, amend, reissue or cancel and charge double fees for calls made after 5 PM or on weekends or public holidays. And, to add to these costs, NOV employees had to ride a cab to and from the airport causing NOV an increase of at least $100 per ticket. All this for approximately 2500 to 3000 tickets issued per year just for the UAE operations.

Example 2.
NOV in the UAE used to procure medical insurance for all its employees and their dependents, as was required by the UAE law, direct from a local insurance company. Every year there was a selection process and the incumbent provider usually added to the existing benefits and kept the premiums flat or there was an occasional slight increase or sometime special consideration to cover claims that were not part of the scope to assist our employees. However, NOV in Houston, based on a global arrangement introduced an "agent" into the equation. This introduction straightaway added 9% to the cost of the approximately AED 20M premium. The introduction of an agent also meant that the NOV employees could not contact or negotiate with the insurance company direct. However, in 2015 at renewals as the agent could not add any value despite them getting their $500K in commissions, the defendant Sadeesh called the insurance company direct and negotiated a 10% discount to save NOV a little over $550K.

Example 3.
All photocopiers in the NOV UAE offices are leased. If an analysis of the lease payments made for 2 years versus the cost of the equipment is done, it would definitely show that the "buy" option was better. But NOV believed in leasing only as the exit was also easier and NOV did not have to carry any assets on its books if they were to exit.

Example 4.
In the UAE, NOV leases about 125+ cars (as of late 2015). These were usually a 2 or 3 year lease. As with the photocopiers, if the math was done for lease payments made versus purchase of the

same, it was definitely the "buy" option that would make sense. But this was NOVs standard practice.

Example 5.
In the UAE the printers in the NOV offices are also leased. Same as the above for photocopiers and the cars, the buy option would have been more economical, but as mentioned, NOV standard practice prevailed.

I have never held any ownership interest in, or served as an employee or officer of GBS, Orient Consulting, Orient Energy Services, LLC, Viyatek, or Overseas Development and to my knowledge nor have any of the defendants or Mr. Matta.

Subject to and without waiving my respectful and continuing objection to the assertion of personal jurisdiction over me by this Court, I make this declaration and declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed on March 01, 2018.

Sadeesh Sadagopan


Submitted with the utmost respects
**Sadeesh Sadagopan**
*(Sadeesh.Sadagopan@gmail.com)*