United States District Court
Southern District of Texas
**ENTERED**
August 13, 2018
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| NATIONAL OILWELL VARCO, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. H-16-2261 |
| SADEESH SADAGOPAN, | § | |
| MAJED HAMDAN, and | § | |
| KHALED ZANTOUT | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION ON NOV'S
MOTION FOR FINAL DEFAULT JUDGMENT**

## I.      Background

In May 2016, NOV filed its original and first amended petitions against the defendants,

Sadeesh Sadagopan, Majed Hamdan, and Khaled Zantout, in the 334th Judicial District Court of

Harris County.  (Docket Entry Nos. 1-2, 1-3).  The case was removed to federal court on the basis

of diversity jurisdiction.  (Docket Entry No. 1).  The defendants filed motions to dismiss based on

personal jurisdiction and *forum non conveniens*.  (Docket Entry No. 2).  In July 2017, after a year

of jurisdictional discovery, hearings, and briefing, the court found that it had personal jurisdiction

over the defendants and denied their motion to dismiss.  (Docket Entry No. 77).  In August 2017,

NOV filed its fourth amended complaint, the operative complaint.  (Docket Entry No. 97).  Two of

the defendants, Hamdan and Zantout, answered; the third defendant, Sadagopan, did not.  (Docket

Entry Nos. 104, 105).  In January 2018, all three defendants requested entry of default against

themselves.  (Docket Entry Nos. 115, 116).  The court granted the parties' agreed motion for entry of default on liability.  (Docket Entry Nos. 118, 119).

NOV moved for final default judgment.  The defendants responded, NOV replied, and the defendants surreplied.  (Docket Entry Nos. 121, 122, 123, 124).  After a hearing held on March 9, 2018, the parties filed supplemental briefing regarding the application of a settlement credit to the default judgment.  (Docket Entry Nos. 125, 128, 130, 131).

Based on the pleadings, the default judgment briefing, the record, and the applicable law, NOV's motion for a default judgment, (Docket Entry No. 121), is granted, in part.  The reasons are explained below.

## II.    The Legal Standard

Under Fifth Circuit law, there must be a default and entry of default before a plaintiff can obtain a default judgment.  *New York Life Ins. Co. v. Brown*, 84 F.3d 137, 141 (5th Cir. 1996).  "A default occurs when a defendant has failed to plead or otherwise respond to the complaint within the time required by the Federal Rules.  An entry of default is what the clerk enters when the default is established by affidavit or otherwise.  After defendant's default has been entered, plaintiff may apply for a judgment based on such default.  This is a *default judgment*."  *Id.* (emphasis in original) (citations and footnote removed).  District courts in the Fifth Circuit have characterized that language as establishing a "three-step process," in which default precedes entry of default and entry of default precedes default judgment.  *See American States Ins. Co. v. Arete Real Estate & Devel.*, 2009 WL 854836, at *2 (N.D. Tex. Mar. 30, 2009); *Allstate Texas Lloyds v. Shah*, 2009 WL 1025399, at *2 (E.D. Tex. Apr. 16, 2009); *Lester v. Lester*, 2008 WL 5110842, at *2 (N.D. Tex. Dec. 4, 2008);

CHARLES A. WRIGHT ET AL., 10A FEDERAL PRACTICE & PROCEDURE § 2682 (4th ed.) ("Prior to obtaining a default judgment . . . there must be an entry of default . . . .").

"[A] defendant's default does not in itself warrant the court in entering a default judgment. There must be a sufficient basis in the pleadings for the judgment entered." *Nishimatsu Const. Co. v. Houston Nat. Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975). "A default judgment is unassailable on the merits but only so far as it is supported by well-pleaded allegations, assumed to be true." *Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 496 (5th Cir. 2015) (quotation omitted). Put differently, "[t]he defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law." *Id.* A complaint must "advance[] a colorable claim for relief and provide[] [the other party] the requisite notice to satisfy Rules 8 and 55." *Id.* at 497 98.

Federal Rule of Civil Procedure 55(b)(1) permits the clerk to enter a default on certain conditions. Rule 55(b)(2) prohibits the court from entering default judgment "[i]f the party against whom judgment by default is sought has appeared in the action." FED. R. CIV. P. 55(b)(2). The court "may conduct hearings . . . when, to enter or effectuate judgment, it needs to: (a) conduct an accounting; (b) determine the amount of damages; (c) establish the truth of any allegation by evidence; or (d) investigate any other matter." *Id.*

"As a general proposition, in the context of a default judgment, unliquidated damages normally are not awarded without an evidentiary hearing. That rule, however, is subject to an exception where the amount claimed is a liquidated sum or one capable of mathematical calculation." *James v. Frame*, 6 F.3d 307, 310 (5th Cir. 1993) (footnote omitted). "A district court may rely on detailed affidavits establishing the necessary facts . . . ." *PlainsCapital Bank v. Anaya-Gomez*, 2017 WL 971655, at *2 (S.D. Tex. Mar. 14, 2017). A court "may conduct hearings" to

"determine the amount of damages," "establish the truth of any allegation by evidence," or "investigate any other matter." FED. R. CIV. P. 55(b)(2); *see also* 10A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2688 (4th ed.) ("[W]hen it seems advantageous, a court may conduct a hearing to determine whether to enter a judgment by default.").  "Unlike questions of actual damage, which must be proved in a default situation, conduct on which liability is based may be taken as true as a consequence of the default." *Frame v. S-H, Inc.*, 967 F.2d 194, 205 (5th Cir. 1992).

## III.    The Parties' Contentions

### A.    NOV's Motion for Default Judgment

NOV pleaded causes of action against each of the defendants: (1) fraud; (2) fraud by nondisclosure; (3) conspiracy to defraud; (4) breach of contract; (5) breach of fiduciary duties; and (6) aiding and abetting breach of fiduciary duties. (Docket Entry No. 97 at 14  19).  NOV argues that its claims are well-pleaded and that, by defaulting and agreeing to the entry of default, the defendants admitted the allegations establishing their liability.  (Docket Entry No. 120 at 8); *Frame*, 967 F.2d at 205.  NOV claims that it is entitled to a final default judgment of $21,796,757 in compensatory damages against the defendants, jointly and severally.  (Docket Entry No. 120 at 9).  The amount consists of two categories of damages: (1) $18,791,503 worth of proceeds the conspirators[1] received from their several schemes against NOV; and (2) $3,005,254 worth of nonsalary stock awards and bonuses NOV gave to the defendants during the course of the schemes.  *Id.* at 9  10.

---

[1] The "defendants" are the three named defendants: Sadeesh Sadagopan, Majed Hamdan, and Khaled Zantout.  The "conspirators" are Sadagopan, Hamdan, Zantout, and FM.  NOV's claims against FM were arbitrated and a final award was issued on December 15, 2017.  (Docket Entry No. 130-1 at 11).  NOV and FM entered into a settlement agreement on February 22, 2018.  *Id.* at 1.

As to the first category, NOV seeks the disgorgement of the profits the conspirators collected as the result of four schemes: (1) the Orient scheme; (2) the Global Business Supply scheme; (3) the Vivatek scheme; and (4) the "spreadsheet" schemes. *Id.* at 10.  NOV argues that the collective profit from these four schemes was $18,791,503.  *Id.* at 12.  NOV asserts the following breakdown of disgorgeable proceeds from each scheme:

- NOV paid $11,433,356 to the sham entity "Orient Consultants"   a company created and established by the defendants   representing the conspirators' collective proceeds for the Orient scheme.  (Docket Entry Nos. 120 at 12, 120-1 at ¶ 8).

- NOV paid $1,854,610 to the sham entity "Global Business Supply"   a company created and established by the defendants   to lease equipment.  (Docket Entry Nos. 120 at 12  13, 120-1 at ¶ 11).  The total purchase cost for the equipment was $269,401.  (Docket Entry Nos. 120 at 12, 120-1 at ¶ 12).  The conspirators' proceeds (total received minus total spent) was $1,585,209.  (Docket Entry Nos. 120 at 13, 120-1 at ¶ 13).

- NOV paid $2,300,000 to "Viyatek."  (Docket Entry Nos. 120 at 13, 120-1 at ¶ 14).  Viyatek was a legitimate agent of NOV operating in Turkey.  The conspirators directed Viyatek to reroute $1,924,485 of those funds to themselves via Global Business Supply, giving themselves the proceeds from the Viyatek scheme.  (Docket Entry Nos. 120 at 13, 120-1 at ¶ 15).

- The "spreadsheet" reflects that FM's quarter-share of the profits received for additional self-dealing schemes carried out by the Conspirators in Dubai, multiplied by four to reflect each of the four conspirators, is $3,848,453.  (Docket Entry Nos. 120 at 13, 120-1 at ¶¶ 18  19).

NOV also seeks disgorgement of nonsalary bonuses and stock awards.  (Docket Entry No. 120 at 13).  It does not to seek recovery of the defendants' base compensation, but does seek the $3,005,254 the defendants received in bonuses and awards NOV paid:

| Type | Sadagopan | Hamdan | Zantout | TOTAL |
|---|---|---|---|---|
| **Incentive Bonus** | $303,614 | $801,808 | $421,000 | $1,526,422 |
| **Restricted Stock** | $101,073 | $127,630 | $109,225 | $337,928 |
| **Exercised Options** | $269,878 | $475,661 | $395,365 | $1,140,904 |
| **TOTAL** | $674,565 | $1,405,099 | $925,590 | $3,005,254 |

(Docket Entry Nos. 120 at 15, 120-1 at ¶ 21.  NOV claims that it would not have paid the defendants

the bonuses and awards if it had known about the defendants' fraudulent schemes.  (Docket Entry

No. 120 at 15).

NOV asks that the court also award exemplary damages, postjudgment interest at the rate of

5% per year compounded annually, and court costs and attorney's fees supported by a bill of costs

and court motion for attorney's fees and expenses filed within 14 days after judgment is entered.  *Id*

at 15, 18.

### B.    The Defendants' Response

The defendants respond that the final judgment should be a take-nothing judgment, asserting

four reasons.  (Docket Entry No. 121).  First, the defendants argue that under UAE law, which

applies to NOV's tort claims, it is not entitled to recover tort damages.  *Id.* at 5.  The defendants raise

the same arguments they briefed before default was entered.  (Docket Entry No. 113).

Second, the defendants argue that NOV's pleadings are insufficient to support a default

judgment for the damages they seek.  (Docket Entry No. 121 at 17).  The defendants concede that

by their default, they admitted the well-pleaded allegations, *Nishimatsu*, 515 F.2d at 1206, but they

assert that NOV insufficiently pleaded each of its claims.  The defendants further argue that NOV

failed to allege facts sufficient to support a default judgment as to its claims for conspiracy and

aiding and abetting.  *Id.* at 21.  They argue that although the spreadsheet reflects payments

Sadagopan made to or on behalf of FM, no allegations link Hamdan and Zantout to the conspiracy.

*Id.*  Third, the defendants argue that NOV cannot meet its burden of proving damages.  *Id.*

The defendants' arguments as to why the allegations as to each scheme are deficient are as

follows:

- The Global Business Supply scheme: though NOV alleges that the Global Business Supply lease charged inflated rates for leased equipment, it does not allege or show what the reasonable rental rate would have been.  *Id.* at 22.

- The Orient scheme: NOV had to use Orient as an agent to sell products in Oman without a special license, and NOV did not suffer economic damages because it profited from the sales for which it paid commissions to Orient.  *Id.* at 22 24.

- The Viyatek scheme: because NOV made millions of dollars in profits in connection with the Viyatek transaction, NOV cannot show economic damages.  *Id.* at 25.

- The Spreadsheet scheme: NOV cannot show that the spreadsheet itself caused any injury, and the spreadsheet damages seem to repeat other damages already claimed.  *Id.*

Fourth, the defendants argue that NOV is not entitled to disgorgement damages.  *Id.*  The defendants assert that disgorgement is not a remedy for common-law fraud or breach of contract.  *Id.*  They also argue that NOV cannot show that the defendants received improper benefits, including the bonuses and stock awards, which are not subject to disgorgement  because they were well-earned and not proceeds of wrongdoing.  *Id.* at 25  27.

Alternatively, the defendants argue that their liability, if any, should be reduced by the Texas rules of proportional responsibility.  *Id.* at 27; TEX. CIV. PRAC. & REM. CODE, Ch. 33.001 *et seq*.  The defendants also ask that any damages NOV recovers be reduced by the amount of any settlement between NOV and FM.  (Docket Entry No. 121 at 28.).

**C.     NOV's Reply**

NOV replies that the defendant waived the choice-of-law argument, making it moot.  (Docket Entry No. 123 at 1).  NOV also argues that the defendants use the incorrect standard for determining whether a default judgment is substantively warranted.  *Id.* at 8.  According to NOV, instead of a scheme-by-scheme analysis, "the test is whether the factual allegations in NOV's complaint raise a right to relief above the speculative level for each claim."  *Id.*; *Wooten*, 788 F.3d at 498.  Applying

a claim-by-claim analysis, NOV asserts that default judgment is substantively warranted because the facts it pleaded and the evidence submitted show a right to recover on each cause of action.  *Id.* at 9.

NOV argues that the defendants "attempt to raise fact issues about NOV's injuries is untimely and waived" by the defendants' default.  *Id.* at 9  10; *see Breazell v. Permian Trucking & Hot Shot, LLC*, No. 7:15-cv-199-XR, 2017 WL 3037432 at *3 (W.D. Tex. Jul. 18, 2017).  Though NOV agrees that disgorgement may not be an appropriate damages measure for a fraud claim, it argues that the defendants' profit damages amount is the same as the loss NOV suffered from the fraud.  *Id.* at 11.

NOV contests the defendants' request to apply the Texas proportionate responsibility statute.  *Id.* at 12.  NOV notes that courts have held that the proportionate responsibility statute does not abolish or replace joint and several liability in the context of a civil conspiracy to defraud.  *In re Enron Corp. Secs.*, 623 F. Supp. 2d 798, 835 (S.D. Tex. 2009) ("Joint and several liability for common-law civil conspiracy to defraud was not abolished by Chapter 33.").  NOV additionally argues that the defendants waived their proportionate responsibility argument because it is an affirmative defense waived by default.  *Simon v. BancTexas Quorum, N.A.*, 754 S.W.2d 283, 286 (Tex. App.   Dallas 1988, writ denied) ("[B]y default, [Defendants] waived [the] right to present evidence raising a fact issue on the elements necessary to [their] affirmative defense of avoidance.").

Finally, NOV moves to strike the declarations and exhibits the defendants attached to their responsive brief, on hearsay and relevancy grounds.  *Id.* at 14  15.

### D.    The Defendants' Surreply

The defendants' surreply repeats their choice-of-law, disgorgement, and proportionate-

responsibility arguments.   (Docket Entry No. 124 at 2 7).   The defendants moved to compel production of the settlement agreement between NOV and FM for the purpose of determining FM's percentage of responsibility.   *Id.* at 7.   The defendants also objected to parts of the declaration of Jason Pack, NOV's vice-president of internal audit, submitted as part of NOV's motion for default judgment.   *Id.* at 8.

The defendants reply to NOV's motion to strike by arguing that the affidavits they presented are relevant to the choice-of-law determination.   *Id.* at 8.   They also argue that the declaration testimony they rely on is relevant to the choice-of-law, damages, equitable relief, causation, punitive damages, and proportionate-responsibility issues. *Id.* at 9.

IV.     **Analysis**

A.      **The Evidentiary Issues**

1.      **NOV's Motion to Strike Declarations and Exhibits**

NOV argues that the defendants' declarations, attached to their response to NOV's default judgment motion are hearsay.   *Id.* at 14; (Docket Entry Nos. 121-8, 121-9, 121-10, 123 at 14).   NOV also moves to strike the declarations because they fail to discuss damages and are irrelevant.  (Docket Entry No. 123 at 14  15); FED. R. EVID. 402.   The declarations discuss the defendants' employment by NOV and contest various facts.   These facts, however, go to liability, which was established by the default.   The declarations do not address the actual damages amounts or theories, the issue remaining.  (Docket Entry Nos. 121-8, 121-9, 121-10).   The declarations are stricken as irrelevant.

NOV also moves to strike news articles and charts the defendants filed as attachments to their response to NOV's default judgment motion.  (Docket Entry Nos. 121-2, 121-3, 121-13, 121-14, 121-15, 123 at 15).   The articles discuss issues such as the Jebel Ali Free Zone's impact on global

trading, the status of paper money in the United Arab Emirates, and labor migration.  (Docket Entry Nos. 121-2, 121-13, 121-14).  The attachments have no bearing on the damages issues and are stricken as irrelevant.

Third, NOV moves to strike unfiled exhibits.  (Docket Entry No. 123 at 15).  The court will not consider exhibits that were not filed.

## 2.    The Defendants' Motion to Compel

The defendants move to compel production of the settlement agreement between NOV and FM for purposes of determining FM's percentage of responsibility.  (Docket Entry No. 124 at 7).  The motion to compel is denied as moot because the settlement agreement was entered into the record during the March 9 motion hearing.  (Docket Entry No. 128 at 34).

## 3.    The Defendants' Motion to Strike

The defendants move to strike paragraphs 18  19 and 22  25 of Jason Pack's declaration, which NOV submitted in support of its motion for default judgment.  (Docket Entry No. 124 at 8).  The defendants argue that Pack's statements are "conclusory, speculative, and assume facts not in evidence."  *Id.*  Paragraphs 18  19 and 22  25 of Pack's declaration state:

18.    As referenced in the Complaint, the Spreadsheet has been revealed to reflect an accounting of FM's quarter (1/4) share of additional funds siphoned by the Conspirators from NOV through improper transactions and kickbacks in Dubai.  *See* Compl. ¶¶ 32-37.  In total, the Spreadsheet documents FM's quarter (1/4) share of the proceeds for the underlying transactions as AED 3,533,803.  *See* Ex. D.

19.    Based on the above, the Conspirators' collective proceeds for the Spreadsheet schemes, as alleged in the Complaint and for which NOV's claims against Defendants asserted in the Complaint relate, is calculated as AED 3,533,803 x 4   AED 14,135,211 or $3,848,453.

. . .

22.    NOV would not have granted, awarded, or released, and the Conspirators

would not have received, the amounts referenced in the paragraph above had NOV been aware of the actions described in the Complaint or had Defendants disclosed those actions to NOV as required.

. . .

23.     The amounts identified in the paragraphs above combine to reflect the amounts that the Conspirators are understood and alleged to have received to NOV's detriment as a natural result of the actions and schemes made the basis of NOV's Complaint.  Specifically, these amounts are $11,433,356 for the Orient Consultants scheme, $1,585,209 for the [Global Business Supply] scheme, $1,924,485 for the Viyatek scheme, $3,848,453 for the Spreadsheet schemes, and $3,005,254 for the non-salary awards, for a total amount of $21,796,757.

24.     Based on my investigation and the evidence I have collected and reviewed to date, the amounts documented herein are likely to represent only a portion of the funds siphoned from NOV by the Conspirators during the course of their employments with NOV.  I have also been made aware that Defendants have refused to produce their complete financial records in this matter, electing instead to voluntarily default for the claims asserted by NOV in the Complaint.

25.     Based on my investigation the evidence [sic] I have collected and reviewed to date, it is my opinion and belief that the financial records Defendants have refused to produce in this matter are likely to reveal evidence of additional amounts siphoned from NOV for which NOV is not presently aware.  NOV's investigation of this matter remains ongoing.

(Docket Entry No. 120-1 at 3  4 (footnote omitted)).

Pack's declaration is relevant to the damages determination and is based on his personal role as the lead investigator into the defendants' conduct.  *Id.* at 1.  Paragraphs 24 and 25, however, are speculative and are stricken.  The court will consider the weight to be given the other paragraphs the defendants challenged in considering the totality of the evidence NOV has provided.

## B.     The Defendants Have Waived Their Choice-of-Law Argument

The defendants argue that they have not waived their argument that United Arab Emirates law applies because, although they "are deemed to have admitted the well-pleaded factual allegations

in NOV's complaint, . . . they may still contest issues relating to law or damages." (Docket Entry No. 124). A defendant does not "admit facts that are not well-pleaded or . . . admit conclusions of law" by defaulting. *Wooten*, 788 F.3d at 296; Steven Baiker-McKee, William M. Janssen & John B. Corr, *Federal Civil Rules Handbook* 1114 (2015 ed.) ("Upon entry, a defaulting party is deemed to have admitted all well-pleaded allegations of the complaint (except for the amount of damages); allegations that are not well-pleaded, as well as conclusions of law, are not deemed admitted."). But choice of law is not in the category of "conclusions of law" that courts allow to be contested after entry of default. A defendant may challenge the legal conclusion that certain "unchallenged facts constitute a legitimate cause of action." CHARLES A. WRIGHT ET AL., 10A FEDERAL PRACTICE & PROCEDURE § 2688.1 (4th ed.); *Atl. Recording Corp. v. Lopez*, 2007 WL 2010752, at *1 (S.D. Tex. July 5, 2007) ("[D]efault judgment may be awarded only if the facts alleged in the complaint, if assumed true, would establish liability as a matter of law."); *Gross v. RSJ Int'l, LLC*, No. CIV.A. 11-73, 2012 WL 729955, at *3 (E.D. La. Mar. 6, 2012).

> The Eleventh Circuit has explained what a party may challenge after default:
>
> [B]efore entering a default judgment for damages, the district court must ensure that the well-pleaded allegations in the complaint, which are taken as true due to the default, actually state a substantive cause of action and that there is a substantive, sufficient basis in the pleadings for the particular relief sought. At that point, the defendant, even though in default, is still entitled to contest the sufficiency of the complaint and its allegations to support the judgment being sought.
>
> A defaulted defendant also can defend by challenging the jurisdiction of the court to enter judgment against him. Thus, for example, a defendant in default still can challenge the validity of service of process or contest the court's exercise of personal jurisdiction over him.
>
> Other than the narrow exceptions discussed above, a defendant, once a default has been entered against him, is not entitled to raise any other defenses.

*Tyco Fire & Sec., LLC v. Alcocer*, 218 F. App'x 860, 863‑84 (11th Cir. 2007) (citation and footnotes

omitted).   The defendants' choice-of-law argument does not challenge the sufficiency of the complaint allegations to support the damages judgment.  Nor does the argument challenge the court's exercise of personal jurisdiction.  The argument is waived.

Even if the defendants could contest choice of law after they defaulted, they waived the argument by agreeing to the entry of default before the court determined the issue.  *ARV Offshore Co. v. Con-Dive, L.L.C.*, 2012 WL 176322, at *6 (S.D. Tex. Jan. 20, 2012), *aff'd*, 514 F. App'x 524 (5th Cir. 2013) ("A choice-of-law issue must be raised to the district court 'in time to be properly considered.'") (citing *Kucel v. Heller & Co.*, 813 F.2d 67, 74 (5th Cir. 1987)).  The defendants argue that they timely raised their choice-of-law argument on three occasions: (1) in their briefs on their motion to dismiss for *forum non conveniens*; (2) in their Rule 44.1 notice of foreign law; and (3) in their response to NOV's default judgment motion.  (Docket Entry No. 124 at 2  3).

In January 2017, the defendants moved to dismiss under *forum non conveniens*.  (Docket Entry No. 45 at 15).  The defendants argued that transferring the case to the United Arab Emirates would be more convenient because employment agreements and regulations governing NOV's business in Dubai incorporated United Arab Emirates law.  *Id.* at 20  21.  The defendants asserted that the remedies NOV sought would be available in the United Arab Emirates.  *Id.* at 18.  The court held that resolving the choice-of-law dispute was premature.  *Id.* at 21; (Docket Entry No. 77 at 16).

In January 2018, one year later, the defendants filed a notice of the applicability of foreign law, under Federal Rule of Civil Procedure 44.1.  (Docket Entry No. 113); FED. R. CIV. P. 44.1 ("A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing.  In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of

Evidence.  The court's determination must be treated as a ruling on a question of law.").  The defendants argued that United Arab Emirates law applied.  *Id.*  Contrary to the position the defendants took in their motion to dismiss under *forum non conveniens*, they then asserted that United Arab Emirates law did not recognize or allow the tort claims NOV sought.  *Id.* 1 4.  One week later, default was entered against the defendants at their own request.  (Docket Entry Nos. 115, 116, 118, 119).

By voluntarily defaulting, the defendants "concede[d] liability on all causes of action alleged in [NOV's] complaint," to the extent that those allegations, if true, would establish liability as a matter of law.  *Chanel*, 2013 WL 5425252, at *4 (citing *Fehlhaber*, 681 F.2d at 1026).  Conceding liability waived the defendants' opportunity to challenge the basis of that liability through their choice-of-law argument.  This is particularly true given that the defendants agreed to the entry of default before NOV had an opportunity to respond to the choice-of-law argument.  The defendants' argument was not raised "in time to be properly considered."  *Kucel*, 813 F.2d at 74.

For the reasons stated above, the defendants' argument that they preserved their choice-of-law argument in their response to NOV's default judgment motion is also unpersuasive.  The defendants' response came after they agreed to the entry of default and after default was entered, too late to be considered now.

### C.    A Default Judgment Is Substantively Warranted

The parties dispute the standard used to determine whether a default judgment is substantively warranted. *Nishimatsu Const. Co. v. Houston Nat. Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) ("There must be a sufficient basis in the pleadings for the judgment entered."); *Wooten*, 788 F.3d at 497 ("We begin by determining whether [the] complaint, either standing alone or considered

together with . . . testimony at the hearing, supplied an adequate foundation for the default judgment."). The defendants argue that a default final judgment is not substantively warranted because NOV's complaint is insufficient to impute liability to each defendant for each scheme. (Docket Entry No. 121 at 17  21). NOV responds that the defendants' scheme-by-scheme standard is overly rigid and that its complaint "raise[s] a right to relief above the speculative level for each claim." (Docket Entry No. 123 at 8 (emphasis in original)). NOV has the better argument. The question is whether the complaint "advanced a colorable *claim for relief* and provided [the defendants] with the requisite notice to satisfy Rules 8 and 55." *Wooten*, 788 F.3d at 497 98 (emphasis added). Deciding whether a default judgment is substantively warranted requires determining whether the claims in a complaint are sufficiently pleaded.

The *Wooten* court held that the Rule 8 standard applies to determining whether a complaint's provides "well-pleaded allegations" support a default judgment:

> Rule 8(a)(2) requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of this requirement is "to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The factual allegations in the complaint need only "be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (footnote and citations omitted). "[D]etailed factual allegations" are not required, but the pleading must present "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

*Id.* at 498.

NOV's fourth amended complaint, the operative complaint, pleads six causes of action against the defendants: (1) fraud; (2) fraud by nondisclosure; (3) conspiracy to defraud; (4) breach

of contract; (5) breach of fiduciary duties; and (6) aiding and abetting breach of fiduciary duty.[2]

(Docket Entry No. 97).  NOV alleged the following:

- The defendants were all employed by NOV: Sadagopan was hired in 1999 and Hamdan and Zantout were hired in 2003.  *Id.* at ¶¶ 9  11.

- Each of the defendants worked in the Middle East and North Africa operating region, at least during part of their employment with NOV.  *Id.*

- The defendants were fiduciary employees and were required to comply with NOV's Business Ethics Policy and Code of Conduct, which prohibit bribes, payoffs, kickbacks, among other actions.  *Id.* at ¶ 12  13, 17.

- The Business Ethics Policy, Code of Conduct, and other policies prohibit undisclosed and unapproved conflicts of interest.  *Id.* at ¶ 19.

- NOV granted stock awards and incentives to the defendants and FM, who represented that they were in compliance with the Business Ethics Policy and Code of Conduct.  The stock awards and incentives were granted in reliance on the representations of compliance with fiduciary duties and the Business Ethics Policy and Code of Conduct.  *Id.* at ¶ 14.

- FM was a fiduciary employee of NOV who, in addition to being required to comply with the Business Ethics Policy and Code of Conduct, was also a party to an employment agreement that created additional fiduciary duties.  *Id.* at ¶ 16.

- The defendants and FM had a close friendship.  *Id.* at ¶ 18.

- In 2016, NOV received a whistleblower complaint alleging that NOV employees were leasing forklifts and other equipment in the Middle East and North Africa operating region with undisclosed and unapproved conflicts of interest.  NOV launched an investigation.  *Id.* at ¶ 19.

- NOV discovered multiple leases for heavy equipment in 2009 and 2010 between NOV and Global Business Supply with lease prices materially higher than the market price for the

---

[2] Because the Texas Supreme Court "has not expressly decided whether Texas recognizes a cause of action for aiding and abetting," *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214 (Tex. 2017), the Fifth Circuit recently held that *Erie* does not authorize federal courts to recognize aiding and abetting claims. *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 781 (5th Cir. 2018) ("When sitting in diversity, a federal court exceeds the bounds of its legitimacy in fashioning novel causes of action not yet recognized by the state courts.").  The court does not consider NOV's aiding and abetting breach of fiduciary duty claim in determining whether a final judgment is substantively warranted, nor in calculating NOV's damages.

region and terms favoring Global Business Supply that were not routinely included in heavy equipment leases.  *Id.* at ¶ 20.

- Between 2009 or 2010 and 2016, NOV paid Global Business Supply more than $1,700,000 for the leased equipment, when the leased equipment's sales value was less than $300,000. NOV was proximately harmed by the defendants' and FM's misconduct.  *Id.*

- Sadagopan negotiated the terms of the lease agreements with Global Business Supply with FM's knowledge and participation.  FM once directed Hamdan to execute a lease in FM's place, and other correspondence showed Zantout's involvement.  *Id.* at ¶ 21.

- Global Business Supply was controlled by the defendants and Sadagopan conceded having a financial interest in Global Business Supply.  He conducted negotiations with himself using his NOV email address and his Global Business Supply email address.  *Id.* at ¶ 23.

- In 2007, NOV entered into an agency agreement with Orient Consultants, which was arranged by FM and Hamdan.  *Id.* at ¶ 24.

- Nader Assaf, who signed on behalf of Orient, was a strawman for the defendants and FM. Assaf and Orient were a front for the conspirators to collect commissions to Orient for work that the defendants were already being paid to preform.  Assaf was also a strawman for Global Business Supply.  *Id.* at ¶¶ 26  27.

- In 2007, Orient began submitting invoices to NOV.  *Id.* at ¶ 28.

- Zantout served as NOV's "relationship manager" with Orient, and FM and Hamdan arranged and entered a new agency agreement with Orient in November 2012.  *Id.* at ¶ 29.

- Hamdan and Zantout lobbied for Orient to remain as NOV's agent in Yemen and Oman when NOV questioned commission payments to Orient or sought to terminate the agency agreement between NOV and Orient.  *Id.*

- Since 2007, NOV has paid Orient more than $11,400,000.  *Id.* at ¶ 30.

- Between September 2011 and March 2012, more than $900,000 was transferred from Orient to Amal Jean Mehanna, also known as Amal Mhanna Matta, who is FM's sister-in-law.  *Id.* at ¶ 31.

- Viyatek International transferred more than $1,900,000 to Global Business Supply, at the direction of the conspirators, after NOV paid Viyatek approximately $2,300,000 for alleged commissions.  The invoices were approved by Hamdan and then submitted to NOV in Houston for approval and payment.  *Id.* at ¶ 40.

- NOV discovered a spreadsheet created by Sadagopan reflecting "revenue" and "expenses"

17

between September 2010 and March 2016.  Hamdan's, Zantout's, and FM's initials are reflected in the spreadsheet.  *Id.* at ¶ 32.

• Sadagopan gave FM money and paid for travel expenses, which NOV believes were FM's share of proceeds from the fraudulent schemes.  *Id.*

• The spreadsheet reflects FM's quarter share from the Global Business Supply lease, commercial transactions, and real estate transactions between 2010 and 2016, totaling approximately $960,000.  *Id.* at ¶ 33.

• The spreadsheet shows FM's quarter share of receipts and dividends, approximately $960,000, from the Global Business Supply lease and other commercial and real estate transactions.  *Id.* at ¶ 33.

• The spreadsheet reflects payments to FM of approximately $780,000.  *Id.* at ¶ 34.

• The defendants also obtained similar benefits.  *Id.* at ¶ 36.

• Bank records show payments from Global Business Supply to Rakhee Sadeesh, Sadagopan's wife.  *Id.* at ¶ 38.

• Zantout's wife collaborated with the defendants in an undisclosed scheme whereby NOV rented apartments, for which Zantout's wife was the agent, at inflated rates.  *Id.* at ¶ 39.

NOV's allegations advance colorable claims for relief under each of the causes of action it asserted.

### 1. Fraud

To plead fraud, a plaintiff must allege facts showing that:

(1) the defendant "made a material representation that was false"; (2) the defendant "knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth;" (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and suffered injury as a result.

*JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018), *reh'g denied*, (June 15, 2018).

NOV alleged that the defendants engaged in kickback and embezzlement schemes to siphon

money from NOV for the defendants' personal benefit.  Each defendant is alleged to have committed fraud.  Sadagopan negotiated fraudulent lease agreements with the defendant-controlled Global Business Supply.  Hamdan arranged for and entered into a fraudulent agency agreement with Orient.  Zantout was involved with Global Business Supply leases and served as a relationship manager to the sham company Orient, to which NOV paid millions of dollars.  The complaint sufficiently states fraud claims by alleging that the defendants knowingly made false material representations to National Oilwell with the intent of inducing it to pay them, and that NOV suffered fraud losses relying on those representations.  *Id.*  The allegations put the defendants on notice of NOV's fraud claim and raised the right to relief well above the speculative level.  *Twombly*, 550 U.S. at 555.

### 2.    Fraud By Nondisclosure

To plead fraud by nondisclosure, a plaintiff must allege facts showing that:

> (1) the defendant failed to disclose facts to the plaintiff, (2) the defendant had a duty to disclose those facts, (3) the facts were material, (4) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts, (5) the defendant was deliberately silent when it had a duty to speak, (6) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting, (7) the plaintiff relied on the defendant's nondisclosure, and (8) the plaintiff was injured as a result of acting without that knowledge.

*Blankinship v. Brown*, 399 S.W.3d 303, 308 (Tex. App.   Dallas 2013, pet. denied).  "Fraud by nondisclosure is considered a subcategory of fraud."  *Id.* (quoting *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997)).

NOV alleged that the defendants had a duty to disclose, and to seek approval of, conflicts of interest, and that they hid their fraudulently obtained money from NOV.  By failing to disclose the conflicts of interest created by the fraudulent schemes, each defendant failed to disclose material facts that they had a duty to disclose, and NOV did not know, and did not have an equal opportunity

to discover, the facts that the defendants deliberately failed to disclose the facts in order to mislead

NOV.  As a result of relying on the defendants' nondisclosure and acting without knowing of the

conflicts of interest, NOV suffered financial loss.  *Id.*  These specific allegations put the defendants

on notice of NOV's fraud-by-nondisclosure claim and raise a right to relief above the speculative

level.  *Twombly*, 550 U.S. at 555.

### 3. Civil Conspiracy

To plead civil conspiracy, a plaintiff must allege facts showing that:

> (1) [there was] a combination of two or more persons; (2) the persons seek to
> accomplish an object or course of action; (3) the persons reach a meeting of the
> minds on the object or course of action; (4) one or more unlawful, overt acts are
> taken in pursuance of the object or course of action; and (5) damages occur as a
> proximate result.  An actionable civil conspiracy requires specific intent to agree to
> accomplish something unlawful or to accomplish something lawful by unlawful
> means.

*MVS Int'l Corp. v. Int'l Advert. Sols., LLC*, 545 S.W.3d 180, 196 (Tex. App.   El Paso 2017, no

pet.).

NOV alleged that the defendants and FM worked together to run the fraudulent schemes.

The defendants ran the sham company Global Business Supply.  Sadagopan negotiated equipment

lease terms between NOV and Global Business Supply, with FM's knowledge and participation.

Hamdan and Zantout were also involved in the fraudulent leases between NOV and Global Business

Supply.  Hamdan and FM arranged an agency agreement between NOV and the sham company

Orient.  Hamdan and Zantout lobbied for Orient to remain as NOV's agent in Yemen and Oman.

The defendants ran Global Business Supply and used it, in collaboration with Zantout's wife, to have

NOV rent apartments, for which Zantout's wife was the agent, at inflated rates.  The conspirators

collected the commissions NOV paid to Orient for the commissions.  The complaint sufficiently

states a claim of conspiracy by alleging that the defendants intended and agreed to defraud NOV through multiple fraudulent schemes, and that NOV was harmed as a result. *Id.* The allegations put the defendants on notice of NOV's conspiracy-to-defraud claim and raise a right to relief above the speculative level. *Twombly*, 550 U.S. at 555.

### 4. Breach of Contract

To plead breach of contract, a plaintiff must allege facts showing that: "(1) [there was] a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff was damaged as a result of the breach." *Brooks v. Excellence Mortgage, Ltd*, 486 S.W3d 29, 36 (Tex. App.  San Antonio 2015, pet. denied) (citations and quotations omitted).

NOV alleged that the defendants were required to comply with its Business Ethics Policy and Code of Conduct, which they breached by operating fraudulent schemes and by failing to disclose those schemes, causing NOV to pay millions that the defendants took for their personal benefit. *Id.* The allegations put the defendants on notice of NOV's breach of contract claim and raise a right to relief above the speculative level. *Twombly*, 550 U.S. at 555.

### 5. Breach of Fiduciary Duty

To plead breach of a fiduciary duty, a plaintiff must allege facts showing that: "(1) [there was] a fiduciary relationship existed between the plaintiff and defendant; (2) the defendant breached its fiduciary duty to the plaintiff; and (3) the defendant's breach resulted in injury to the plaintiff or benefit to the defendant." *Neese v. Lyon*, 479 S.W.3d 368, 386 (Tex. App.  Dallas 2015, no pet.) (citation and quotation omitted).

NOV has alleged that the defendants owed fiduciary duties because of their responsibilities

and positions in NOV.  "[C]orporate officers owe fiduciary duties to the corporation they serve . . . ."  *Somers ex rel. EGL, Inc. v. Crane*, 295 S.W.3d 5, 11 (Tex. App.    Houston [1st Dist.] 2009, no pet.) (quotation and citation omitted).  Sadagopan was NOV's vice-president of administration for the Middle East and North Africa operating region.  He was "responsible for soliciting, negotiating, evaluating and recommending bids and quotes for NOV for certain equipment.  (Docket Entry No. 97 at ¶ 9).  Hamdan was NOV's vice-president of sales for land rigs in the Middle East and North Africa operating region.  He was given "a power of attorney for authority to enter into leases, purchase contracts, bid tenders, equipment rental agreements, and commercial proposals on NOV's behalf."  *Id.* at ¶ 10.  Zantout was NOV's regional sales manager for land rigs in the Middle East and North Africa operating region.  NOV alleged that the defendants breached their fiduciary duties of loyalty and good faith, harming NOV by abusing their positions to obtain money from NOV for their personal gain.  *Neese*, 479 S.W.3d at 386.   The allegations put the defendants on notice of NOV's breach-of-fiduciary duties claim and raise a right to relief above the speculative level.  *Twombly*, 550 U.S. at 555.

NOV's complaint is sufficiently pleaded to satisfy "the low threshold of Rule 8" and provide the defendants fair notice of its claims.  *Wooten*, 788 F.3d at 498.   "The allegations are a far cry from the sort of 'unadorned, the-defendant-unlawfully-harmed-me accusation' described in *Iqbal*."  *Id.* (citing *Iqbal*, 556 U.S. at 678).  NOV's fourth amended complaint is "well-pleaded" for default-judgment purposes.  A default judgment is substantively warranted.

### D.    The Damages Determination

The next issue is the damages amount.  In contrast to well-pleaded allegations, damages are not assumed to be true.  *Nishimatsu*, 515 F.2d at 1206.  In the default judgment context, unliquidated

damages are not routinely awarded without an evidentiary hearing. *Frame*, 6 F.3d at 310. The parties submitted exhibits with their default judgment briefs, and the court held a Rule 55(b)(2) hearing on March 9, 2018 to determine the amount of damages. (Docket Entry Nos. 120, 121, 124, 125, 128). At the hearing, NOV called Jason Pack as a witness. Pack served as NOV's vice-president of internal audit and was the lead investigator into the defendants' conduct. (Docket Entry No. 120-1 at ¶¶ 2 3). The following damage calculations are based on the parties' submitted exhibits and Pack's credible testimony.

### 1.    Actual Damages from the Fraudulent Schemes

NOV seeks $18,791,503 in actual damages caused by the defendants' four fraudulent schemes. (Docket Entry No. 120 at 12). Those are the Orient scheme; the Global Business Supply scheme; the Viyatek scheme; and the Spreadsheet schemes.

### i.    Orient

NOV seeks $11,433,356 that it paid Orient. *Id.* NOV alleged that Orient was a sham company and that "the claimed 'services' of Orient Consultants, if any, were performed by the Conspirators as part of their roles at NOV for which they were already compensated by their salaries." *Id.* NOV's expert, Jason Pack, testified that defendants created a shell company that purported to be NOV's "agent" in Oman, in order to receive commission payments for sales from NOV that the defendants were already obligated to make. (Docket Entry No. 128 at 27 29). Pack testified that the entire amount NOV paid to Orient would have remained in NOV's bank account if not for the defendants' fraudulent actions. *Id.* at 29.

The defendants responded that Omani law prohibited NOV from selling products without a special license or an agent. (Docket Entry No. 121 at 23). They also argued that NOV profited from

the sales for which it paid commissions to Orient and did not suffer economic harm as a result.  *Id.* at 24.  During Pack's cross-examination, he confirmed that Orient made payments to individuals other than the defendants.  (Docket Entry No. 128 at 53 58).  A spreadsheet reflecting $11,433,356.54 in payments made by NOV to Orient was submitted as an attachment to Pack's declaration.  (Docket Entry No. 120-1 at 5).

The defendants do not challenge the accuracy of the amount that NOV paid to Orient. Rather, they argue that Orient was not a sham company and that not all of the money NOV paid Orient went to the defendants.  Neither of these arguments is persuasive or enough to reduce the damages NOV is entitled to receive for the money the defendants received or caused NOV to pay as part of the fraud.  By defaulting and agreeing to the entry of default, the defendants admitted to the sufficiently plead allegations that Orient was a shell company established to carry out the defendants' fraud.  *Wooten*, 788 F.3d at 496; *Frame*, 967 F.2d at 205.  The evidence that some of the money the defendants had NOV pay Orient went from Orient to both the defendants and to others does not reduce the harm to NOV.  Texas law does not limit a defendant's obligation to pay fraud damages for money directly or exclusively received by that defendant.  *JPMorgan*, 546 S.W.3d at 653.  NOV is entitled to recover the $11,433,356 the defendants fraudulently caused it to pay to Orient.

### ii.     Global Business Supply

Second, NOV argues that it is entitled to $1,585,209 that the defendants caused it to pay to Global Business Supply.  (Docket Entry No. 120 at 12 13).  It asserts that Global Business Supply was a sham company, run by the defendants, that purchased heavy equipment for lease to NOV at inflated rates.  *Id.* at 2.  The $1,585,209 represents the difference between the amount NOV paid to

Global Business Supply   $1,854,610   minus the defendants' purchase cost for the equipment, $269,401. *Id.* at 12  13.  The defendants respond that NOV has not shown what a reasonable rental rate for the equipment would have been had it leased the equipment from another, nonfraudulent source.  (Docket Entry No. 121 at 22).  At the evidentiary hearing, Pack credibly testified that the defendants purchased the equipment, leased it to NOV at inflated rates, and had NOV pay repay costs.  (Docket Entry No. 128 at 11).  On cross-examination, Pack testified that NOV would have had to pay another supplier to lease the equipment from an entity if it did not lease from Global Business Supply.  *Id.* at 70.  Documents reflecting the equipment purchase lease were submitted as attachments to Pack's declaration.  (Docket Entry No. 120-1 at 6  23).

NOV argues it is entitled to the amount that it would have paid had it purchased the equipment itself rather than lease from Global Business Supply.  The defendants argue that NOV is entitled only to the amount it would have paid had it leased from another entity under reasonable rates.

 "The ordinary measure of damages in a fraud case is the actual amount of the plaintiff's loss that directly and proximately results from the defendant's fraudulent conduct."  41 Tex.  Jur. 3d Fraud and Deceit § 105 (citing *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194 (Tex. 2011); *O'Brien v. Daboval*, 388 S.W.3d 826 (Tex. App.   Houston [1st Dist.] 2012)).  NOV's argument is supported by credible evidence and by case law.  "[W]here the prevailing party fails to elect between alternative measures of damages, the court should utilize the findings affording the greater recovery and render judgment accordingly."  *Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 367 (Tex. 1987); *see also Quest Med., Inc. v. Apprill*, 90 F.3d 1080, 1093 (5th Cir. 1996).  Pack credibly testified that if NOV had not entered into the leases with Global Business

25

Supply, the difference between the lease amounts NOV paid to Global Business Supply and the amounts the defendants had paid to purchase the equipment they leased through Global Business Supply would have remained in NOV's bank account. (Docket Entry No. 128 at 70). If the defendants had purchased the equipment for NOV directly, rather than for their sham company Global Business Supply, NOV would not have paid more than $1.5 million dollars worth of lease payments. The defendants purchased the equipment and fraudulently profited from the inflated lease prices they charged NOV, prices far greater than what the defendants paid. This scheme directly and proximately caused NOV to pay money that it would otherwise have avoided paying had it, and not Global Business Supply, purchased the equipment. NOV is entitled to recover $1,585,209 that it paid Global Business Supply.

### iii.    Viyatek

Third, NOV argues that it is entitled to recover the $1,924,485 it paid to Viyatek. (Docket Entry No. 120 at 13). It asserts that the defendants arranged for NOV to pay Viyatek $2,309,921 in commission payments, and then had Viyatek to transfer $1,924,485 to Global Business Supply. *Id.* at 2; (Docket Entry No. 97 at ¶ 40). Pack testified that Viyatek was not a sham company and that some of payments it received from NOV were legitimately earned, but that the money it routed to Global Business Supply, the defendants' sham company, was not. (Docket Entry No. 128 at 30  31). Pack credibly testified that NOV paid Viyatek $300,000 more than Viyatek paid Global Business Supply, money that benefitted the defendants but added no value to what NOV received. *Id.* at 33.

The defendants argue that Viyatek hired Global Business Supply for logistical assistance related to a sale of rigs. (Docket Entry No. 121 at 24  25). They argue that NOV profited from the sale, for which it paid commissions to Viyatek, and that NOV suffered no economic harm as a result.

26

*Id.* at 25.   Records reflecting the payments NOV made to Viyatek and Viyatek  made to Global Business Supply were submitted with Pack's declaration.  (Docket Entry No. 120-1 at 24).

The defendants do not challenge the accuracy of the amounts NOV paid to Viyatek, or the amounts Viyatek paid to Global Business Supply.  Rather, they argue that some of the money NOV paid Viyatek did not go to Global Business Supply or to the defendants.  By defaulting and agreeing to the entry of default, the defendants have admitted to the sufficiently pleaded allegations that they arranged for NOV to pay Viyatek $2,309,921 in commission payments, and then arranged for Viyatek to transfer $1,924,485 to Global Business Supply, a sham company that the defendants established and operated.  *Wooten*, 788 F.3d at 496; *Frame*, 967 F.2d at 205.  The payments to Viyatek that did not go to Global Business Supply are amounts that NOV would have paid without the scheme.  (Docket Entry No. 128 at 61  66).  The amounts that went to Global Business Supply are the fraud losses NOV suffered from the scheme, even if some of the money paid to Global Business Supply went to entities or individuals other than the defendants.  Texas law does not require that a defendant directly receive money fraudulently obtained by his or her actions. *JPMorgan*, 546 S.W.3d at 653.  NOV is entitled to recover the $1,924,485 that it paid to Viyatek that the defendants had transferred to Global Business Supply.

### iv.    Additional Proceeds

Fourth, NOV argues that it is entitled to $3,848,453 as the proceeds from additional self-dealing schemes.  (Docket Entry No. 120 at 13).  NOV submitted a spreadsheet that Sadagopan created that it argues shows FM's receipt of money.  *Id.*  NOV calculated the $3,848,453 total by multiplying FM's 1/4 share by four to represent what it asserts are the total conspirators' profits.  *Id.* Pack testified:

The spreadsheet represents a one-quarter take by Mr.    Mr. Matta for which Sadeesh Sadagopan was making an accounting of amounts that he held in his bank account and held in hard currency on behalf of Mr. Matta.  The spreadsheet scheme talks to what we believe to be kickbacks and other proceeds of various other schemes, not listing    not the Orient, [Global Business Supply] or Viyatek scheme, but other schemes.

(Docket Entry No. 128 at 12).

Pack testified that NOV could not tie specific spreadsheet line items to transactions in Global Business Supply's or Orient's bank accounts.  Pack acknowledged that the spreadsheet does not show transfers from Global Business Supply or Orient to other entities or individuals.  (Docket Entry No. 128 at 20  21).  But he testified that evidence relating to some of the line items linked those items to amounts the defendants received from fraudulent schemes beyond the four specific schemes involving other undisclosed conflicts of interest.  One line item showed that Sadagopan received 283,520.15 AED on August 28, 2011, from "dividends plus 75K AED, DG apartment sale, minus expenses." (Docket Entry No. 120-1 at 25).  Pack testified that Zantout's wife had billed NOV to lease an apartment lease at Discovery Gardens, in Dubai, in August 2011.  (Docket Entry No. 128 at 17).  But Pack did not testify that the lease linked to the spreadsheet line-item entry, and his testimony is not enough to support awarding NOV this damages amount.

Pack also testified that Zantout's wife had billed NOV for two apartments she leased at Jumeirah Lake Towers, in Dubai.  *Id.* at 18.  He testified that the leases cost 120,000 AED per year. *Id.*  The spreadsheet has line items labeled as "JLT - 40000/4," dated September 23, 2011, November 28, 2011, February 10, 2012, September 22, 2012, November 27, 2012, April 22, 2013, September 19, 2013, and April 27, 2014.  (Docket Entry No. 120-1 at 25  27).  NOV paid 120,000 AED a year

for the leases, in installments of 40,000 AED.[3]  *Id.*  From each of the 40,000 AED payments, Sadagopan received 10,000 AED, as shown by the "10,000.00" receipts accompanying each "JLT - 40000/4" line entry.  *Id.*  Sadagopan received a total of 80,000 AED, based on the eight "JLT - 40000/4" entries and eight "10,000.00" personal receipts entries in the spreadsheet.  *Id.*  But the spreadsheet does not show that other defendants received similar shares from the Jumeirah Lake Towers leases.  Using the conversion rate, (Docket Entry No. 128 at 22), which was not objected to, NOV is entitled to $21,798.37, representing Sadagopan's profits from the lease NOV paid for without a disclosure of who it benefitted or who received the funds.

The remaining line entries do not show a similar link between the defendants' fraudulent conduct resulting in NOV's payments.  The spreadsheet shows payments to Matta by Sadagopan, but not tied to an activity that may have been paid as part of the Orient, Global Business Supply, or Viyatek schemes, and covered in the damages amounts for those schemes.  NOV has also not sufficiently shown that each of the defendants received a quarter share of added proceeds from fraudulent schemes other than the $21,798.37 that Sadagopan received from the Jumeirah Lake Towers leasing scheme.  (Docket Entry No. 128 at 84 (Pack testified that "[a]s [his] best guess as to who received what proceeds, the spreadsheet indicates one-quarter.").

NOV has shown that it is entitled to default judgment for the followign damages amounts resulting from the defendants' fraudulent schemes:

(1) $11,433,356 from the Orient scheme;

---

[3] Three payments of 40,000 AED were made between September 23, 2011 and February 10, 2012 and again between September 22, 2012 and April 22, 2013.  Based on this pattern, it appears as though one payment is missing between September 19, 2013 and April 27, 2014.  The court will award only the amount supported by the spreadsheet.

(2) $1,585,209 from the Global Business Supply scheme;

(3) $1,924,485 from the Viyatek scheme; and

(4) $21,798.37 from other schemes shown in the evidence.

### 2.    Actual Damages from the Bonuses and Stock Awards

NOV also seeks to recover bonuses and stock awards it paid the defendants during their employment.  The parties stipulated that the total was $3,005,254, broken down as follows: $674,565 in incentive bonus, restricted stock, and exercised options for Sadagopan; $1,405,099 for Hamdan; and $925,590 for Zantout.  (Docket Entry Nos. 120 at 15, 128 at 39).  The defendants do not contest the amounts, but argue that the bonuses and stock payments "were well-earned and were not causally related to any wrongdoing.  Instead, similar awards were made to all eligible and similarly-situated [NOV] employees, and were based largely on [NOV's] financial success for a given year, to which the Defendants unquestionably contributed."  (Docket Entry No. 121 at 27).

The defendants' argument is unpersuasive in light of NOV's allegations and the evidence it produced.  NOV alleged that it granted the nonsalary awards in reliance on the defendants' representation that they were in compliance with NOV's Business Ethics Policy and Code of Conduct and with the fiduciary duties they owed NOV to disclose conflicts of interest and to report fraud. (Docket Entry No. 97 at ¶ 14).  Pack testified that NOV awarded bonuses and stock incentive payments under the "Incentive Compensation Plan" based upon the NOV's performance and on the defendants' compliance with NOV's policies.  (Docket Entry No. 128 at 40  41).  Pack credibly testified that NOV would not have paid the incentive awards had it known that the defendants were violating the policies and their own fiduciary obligations and profiting from fraud.  *Id.* at 41.

Because NOV sufficiently alleged that it would not have paid the bonuses and stock awards

if NOV knew of the fraud, NOV is entitled to recover the $3,005,254 it paid the defendants. *Frame*, 967 F.2d at 205.

### 3.   The Impact of the FM Settlement Credit on NOV's Recovery

On December 15, 2017, a final award was issued in the arbitration between FM and NOV. (Docket Entry No. 130-1 at 11).  The arbiter ruled that NOV could collect ▇▇▇▇▇ from FM. *Id.* at 25.  The arbiter awarded ▇▇▇▇ in actual damages and ▇▇▇▇ in exemplary damages. *Id.* at 24  25.  The award explained:



*Id.* at 22  23.

On February 22, 2018, NOV and FM agreed to settle.  *Id.* at 1.  FM would pay NOV ▇▇▇▇.  *Id.* at 2.  Neither party admitted wrongdoing or liability.  *Id.* at 1.  Neither party explained how the settlement amount was calculated.

To apply a settlement credit, the nonsettling defendant must "prove its right to such a credit." *Utts v. Short*, 81 S.W.3d 822, 828 (Tex. 2002).  "Once the non settling defendant demonstrates a right to a settlement credit, the burden shifts to the plaintiff to show that certain amounts should not be credited because of the settlement agreement."  *Id.*   "[T]o limit a nonsettling party's

31

dollar-for-dollar settlement credit to an amount representing actual damages, the settling party must tender a valid settlement agreement allocating between actual and punitive damages to the trial court before judgment.   Otherwise, the nonsettling party is entitled to a credit equaling the entire settlement amount." *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 928 (Tex. 1998) (footnote omitted). "[A] nonsettling defendant can only receive a settlement credit based on the damages for which all tortfeasors are jointly liable, and cannot receive settlement credit for amounts representing punitive damages. '" *Coastal Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A.*, 759 F.3d 498, 511 (5th Cir. 2014).

The parties agree that the defendants, the nonsettling parties, have a right to a settlement credit.  The parties disagree on the second step.  The defendants argue that they are entitled to a credit for the full settlement amount because the agreement does not allocate between actual damages and punitive damages.  (Docket Entry No. 131 at 1  3).  NOV wants to limit the credit amount.

As NOV notes, "[a]rbitration awards are not considered 'settlements' for which defendants are entitled to receive a credit.  (Docket Entry No. 130 at 3 (citing *Pacesetter Pools, Inc. v. Pierce Homes, Inc.*, 86 S.W.3d 827, 831  32 (Tex. App.    Austin 2002)).  That poses a problem for NOV, because the settlement agreement does not allocate actual and punitive damages.  The settlement agreement states:





(Docket Entry No. 130-1 at 1 2).

Because the settlement agreement does not allocate, Texas law entitles the defendants to a credit for the full settlement amount. *Ellender*, 968 S.W.2d at 928.

NOV relies on *Drillex Sys., Inc. v. Flores*, 1 S.W.3d 112 (Tex. 1999), to argue that the settlement credit should be prorated based on the underlying arbitral award. (Docket Entry No. 130 at 3). This argument is unpersuasive. In *Flores*, a floorhand for a drilling contractor injured his hand during a well-drilling operation. *Flores*, 1 S.W.3d at 115. He, his wife, and their three children sued four defendants. *Id.* One of the defendants settled. *Id.* The settlement agreement specified the amounts distributed to each of the five family members. *Id.* at 120. At the trial, the jury awarded each of the family members damages amounts. *Id.*

The Texas Supreme Court held that because the family was one "claimant" under Chapter 33 of the Texas Civil Practice and Remedies Code, the jury damages award had to be reduced by the total settlement amount. *Id.* at 122. The Court deducted the settlement amount and then allocated the remaining jury damages based on the percentage of the jury's award to each family member. *Id.* *Flores* did not address the role of an arbitral award allocation. The case does not eliminate or modify *Ellender*'s requirement that the settling party produce "a valid settlement agreement allocating

between actual and punitive damages" in order to reduce a settlement credit.  *Ellender*, 968 S.W.2d at 928.

The settlement agreement ███████████████████████████████████

████████████████████████████████████████████████████████

(Docket Entry No. 103-1 at 1).  The arbitration proceedings closed in November 2017.  *Id.* at 12. The settlement was reached in February 2018.  (Docket Entry No. 130-1 at 9).  As Pack testified, the investigation continued after November 2017.   (Docket Entry No. 128 at 8).  The settlement agreement does not necessarily reflect the same basis for or allocation of damages as the arbitral award.

Texas law is clear.  To limit a dollar-for-dollar settlement, NOV's settlement agreement must allocate actual and punitive damages.  *Ellender*, 968 S.W.2d at 928.  The settlement agreement between FM and NOV does not.  The defendants are entitled to a settlement credit of ███████, representing the entire settlement amount between FM and NOV.  (Docket Entry No. 130-1 at 2).

## E.    Proportionate Responsibility Does Not Apply

Chapter 33 of the Texas Civil Practice and Remedies Code provides that "[i]n an action to which this chapter applies, a claimant may not recover damages if his percentage of responsibility is greater than 50 percent."   TEX. CIV. PRAC. & REM.CODE § 33.002.  Chapter 33 applies to "any cause of action based on tort."  *Id.* § 33.002; *see also JCW Elecs., Inc. v. Garza*, 176 S.W.3d 618, 626 (Tex. App.   Corpus Christi 2005, reh'g overruled); *JHC Ventures, L.P. v. Fast Trucking*, 94 S.W.3d 762, 773 (Tex. App.   San Antonio 2002, no pet.).  Texas courts apply Chapter 33 to fraud claims and to statutory tort claims that do not include a separate and conflicting legislative fault-allocation scheme.  *See Sw. Bank v. Info. Support Concepts, Inc.*, 149 S.W.3d 104, 111 (Tex. 2004);

34

*Seven Seas Petroleum, Inc. v. CIBC World Markets Corp.*, 2013 WL 3803966, at *22 (S.D. Tex. July 19, 2013) ("[T]he statute applies to all tort claims except those specifically excluded."). Section 33.002(c) lists claims to which proportionate responsibility does not apply. Many of them are irrelevant here, such as actions to collect workers' compensation benefits under the Texas Labor Code. TEX. CIV. PRAC. & REM. CODE § 33.002(c).

State and federal courts have recognized "the settled Texas rule that co-conspirators are jointly and severally liable for all acts done in furtherance of the unlawful combination." *Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 405 (5th Cir. 2013) (citing *Tompkins v. Cyr*, 202 F.3d 770, 783 (5th Cir. 2000); *In re Enron Co. Sec., Derivative & "ERISA" Litigation*, 623 F. Supp. 2d 798, 832 (S.D. Tex. 2009); *Operation Rescue-National v. Planned Parenthood*, 975 S.W.2d 546, 561 (Tex. 1998); *Kirby v. Cruce*, 688 S.W.2d 161, 166 (Tex. App.  Dallas 1985, writ ref'd n.r.e.); *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925 (Tex. 1980); *Kinzbach Tool Co. v. Corbett-Wallace Co.*, 160 S.W.2d 509, 514 (Tex. 1942)); *Bentley v. Bunton*, 94 S.W.3d 561, 619 (Tex. 2002) ("A party who joins in a conspiracy is jointly and severally liable 'for all acts done by any of the conspirators in furtherance of the unlawful combination.'" (citation omitted)).[4]   A

---

[4] The court questions whether the civil conspiracy exception survives the Texas Supreme Court's holding that "[w]hen the Legislature has chosen to impose joint and several liability rather than proportionate liability, it has clearly said so." *F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 690–91 (Tex. 2007); *Pemex Exploracion y Produccion v. BASF Corp.*, 2011 WL 9523407, at *13 (S.D. Tex. Oct. 20, 2011). However, because *Duenez* did not specifically address proportionate liability in the civil conspiracy context, nor explicitly overturn *Bentley* or *Carroll*, and because lower state courts have continued to recognize the civil conspiracy exception post-*Duenez*, this court follows the holding in *Homoki* that Texas law permits joint and several liability for conspirators' acts committed in furtherance of the conspiracy. *See, e.g.*, *Pike v. Texas EMC Mgmt.*, LLC, 2017 WL 2507783, at *5 (Tex. App.—Waco June 7, 2017, pet. filed); *Fitzerman v. Classic Americana, LLC*, 2016 WL 1450165, at *5 (Tex. App.—Dallas Apr. 13, 2016), *supplemented*, 2016 WL 1701345 (Tex. App.—Dallas Apr. 27, 2016), *reh'g overruled* (June 8, 2016); *Holden v. Holden*, 456 S.W.3d 642, 659 (Tex. App.—Tyler 2015, no pet.).

conspiracy participant is liable for "all 'actual damages' resulting from acts in furtherance of the conspiracy." *Quantlab Techs. Ltd. v. Godlevsky*, 2015 WL 2168709, at *3 (S.D. Tex. May 1, 2015) (citing *Enron*, 623 F. Supp. 2d 789)).

NOV alleged conspiracy to defraud against the defendants. (Docket Entry No. 97 at 16). That conduct, sufficiently alleged, is taken as true because of the defendants' default. *Frame*, 967 F.2d at 205 (5th Cir. 1992); *see also Homoki*, 717 F.3d at 405  06; *Pike*, 2017 WL 2507783, at *13. Because NOV proved actual damages from the fraudulent schemes performed in furtherance of the conspiracy, and because each defendant accepted participation in the conspiracy by defaulting and agreeing to the entry of default, the defendants are jointly and severally liable. Proportionate liability under Texas Civil Practices and Remedies Code Chapter 33 does not apply.

### F.    Exemplary Damages Are Not Appropriate

Under Texas law, exemplary damages are recoverable when clear and convincing evidence shows harm resulting from fraud. TEX. CIV. PRAC. & REM. CODE § 41.003(a). Texas law limits the amount of exemplary damages. *Id.* § 41.008(b). Section 41.011 provides:

In determining the amount of exemplary damages, the trier of fact shall consider evidence, if any, relating to:

(1) the nature of the wrong;

(2) the character of the conduct involved;

(3) the degree of culpability of the wrongdoer;

(4) the situation and sensibilities of the parties concerned;

(5) the extent to which such conduct offends a public sense of justice and propriety; and

(6) the net worth of the defendant[s].

36

*Id.* at § 41.011(b); *see also Federal Nat'l. Mortg. Ass'n v. Okeke*, 2006 WL 355241 (S.D. Tex. Feb. 14, 2006); *Wright v. Blythe-Nelson*, 2004 WL 1923871 (N.D. Tex., Aug.26, 2004); *Alamo Nat'l. Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981); *Huynh v. Phung*, 2007 WL 495023, at *10 (Tex. App.   Houston [1st Dist.] Feb. 16, 2007, no pet.); *Long v. United Welding Supply, Inc.*, 2006 WL 1428823, at *11, n. 10 (Tex. App.   Houston [1st Dist.], May 25, 2006, no pet.); *see generally Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 308 (Tex. 2006) (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)).

The allegations the defendants admitted by default are serious.  Through multiple, intricate fraudulent schemes committed over many years, the defendants siphoned millions of dollars from NOV.  But these factors are outweighed by the defendants' inability to pay.  The defendants defaulted in large part because they lacked the resources to defend themselves in legal proceedings in both the United States and Dubai.  (Docket Entry Nos. 115 at 4, 116 at 1) (the defendants represent that they have been unemployed for approximately two years).  The judgment the court enters against the defendants today is sufficient to remedy the harm NOV has suffered.  The court does not award exemplary damages.

## V.    Conclusion

NOV's default judgment motion, (Docket Entry No. 120), is granted. NOV is entitled to recover from Sadeesh Sadagopan, Majed Hamdan, and Khaled Zantout, jointly and severally, the following:

(1) $12,220,102.37 in actual damages;

(2) post-judgment interest at 2.44% per annum as provided by law from entry of judgment

until paid; and

(3) the costs of court as provided in Rule 54(d) of the Federal Rules of Civil Procedure.

The court enters a final judgment consistent with this order.

SIGNED on August 13, 2018, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge